Mr. Justice FIELD
 

 delivered the opinion of the court.
 

 By the custom which has obtained among miners in the Pacific States and Territories, where mining for the precious metals is" had on the public lands of the United States, the first appropriator of mines, whether in placers, veins, or lodes, or of waters in the streams on such lands for mining purposes, is held to have, a better right than others to work the mines or use the waters. The first appropriator who subjects the property to use, or takes the necessary steps for
 
 *511
 
 that purpose, is regarded, exceptas against the government, as the source of title in all controversies relating to the property. As respects" the use of water for mining.purposes, the doctrines of the common law declaratory of the rights of riparian owuers were, at an early day, after the discovery of gold, found to be inapplicable or applicable only in a very limited extent to the necessities of miners, and inadequate to their protection. By the common law the riparian owner'ón a stream not navigable, takes the land to the centre of the stream, and such owner has the. right to the use of the water flowing over the land as an incident to his estate. And as all such owners on the same, stream have an equality, of right to the use of the water, as it naturally flows, iu quality, and without diminution in quantity, except so far as such diminution may be created by a reasonable .use of the water for certain domestic, agricultural, or manufacturing' purposes, there could not be, according to that law, any such diversion .or use of the water by one owner as would work material detriment to any other owner below him. Nor could the water by one owner be so retarded in its .flow as to be thrown back to the injury of another owner above him. “ It is wholly immaterial,”- says Mr. Justice Story, in
 
 Tyler
 
 v.
 
 Wilkinson,
 

 *
 

 “whether the party be a proprietor above or below iu the course of the river; .the right being common to all the proprietors on ,the river, no one has alright to diminish the quantity which will, according to the natural current, flow to the proprietor below, or to throw it back upon a proprietor above. . This is the necessary result of the perfect equality of right among all thé .proprietors of that which is common to all.” “Every-proprietor of lands on the banks of a river,” says Kent, “ has naturally an equal right to the use of the water which flows in the stream adjacent to his lauds, as it was wont to run
 
 (eurrere solebat)
 
 without diminution or alteration. No proprietor has a fight to use the water to the prejudice of other proprietors above.or below him, unless .he has a prior right
 
 *512
 
 to divert it, or a title to some exclusive enjoyment. He has no property in the water itself, but a simple usufruct while it passes along. ’
 
 Aqua currit el debet currere ut currere solebat.
 
 Though he may use the'water while it runs over his land as an incident to the land, he cannot unreasonably detain it or give it another direction, and he must return, it to its ordinary channel when it leaves his estate. Without the consent of the adjoining proprietors he cannot divert or diminish the quantity of the water which would otherwise descend to the proprietors below, nor throw the water back upon.the proprietors above without a grant or an 'Uninterrupted enjoyment of twenty years, which is'evidence of it. This is the clear and settled doctrine on the subject, and all the 'difficulty which arises consists in the application.”
 
 *
 

 This equality of. right among all the proprietors on the same stream would have been incompatible with any ex-tended diversion of the water by one proprietor, and its conveyance for mining purposes to points from which it could not be restored to the stream. But the government being the sole proprietor of all the public lands, whether bordering on streams or otherwise,- theré was no occasion for the application of the common-law doctrine of riparian proprietorship with respect to the waters of-those streams. The government, by its silent acquiescence, assented to the general occupation of the public lands for mining, and, to encourage their free and unlimited use for that purpose, reserved such lands as were mineral from sale and the acquisition of title by settlement. And he who first connects his own labor with property thus situáted and opeu to general exploration, 'does, in natural justice, acquire a better .right to its use and enjoyment than others who have not given such lal 2>i*. So the miners on the public lands throughout the PacifipStates and Territories by their customs, usages,; and regulations everywhere recognized the inherent justice of. this principle; and the principle itself was at an early •period recognized by legislation and. enforced by the courts
 
 *513
 
 in those States and Territories. In
 
 Irwin v. Phillips,
 

 *
 

 a case decided by the Supreme Court of California in-January, 1855, this subject was considered. After stating that a system of rules liad been permitted to grow up with respect to mining on the public lands by the voluntary action and assent of the population, whose free and unrestrained oceu-. pation of the mineral' region had been tacitly assented to by the Federal government, and heartily encouraged by the expressed legislative policy of the State, the court said: “If ■there are, as must be admitted, many things connected with this system which' are crude and undigested, and subject to fluctuation and dispute, there are still some which a universal sense of necessity and propriety have so firmly fixed as • that they have come to be looked upon as .having the force and effect of
 
 res. adjudicata.
 
 Among these the most important are the rights of miners to be protected in their selected localities, and the rights of those who, by prior appropriation, have takeu the waters 'from their natural b,eds, and by. costly artificial works have» conducted them for miles over mountains and ravines to supply-fhe necessities of gold diggers, and without which the most important .interésts of the mineral region would remain without development. So fully recognized have become these rights,-that without any specific legislation conferring or confirming them, they are alluded to and spoken of in-various acts of the legislature in the same manner as if they were rights which had been vested by the most-distinct expression of. the will of the law-makers.”
 

 This doctrine of , right-by.prior appropriation, was recognized by the legislation of Congress in 1866, The act .granting the right of way to ditch and canal owners Over -the public lands, and for other purposes, passed, on the 26th of July of that year, in its ninth section declares “that when-' ever, by priority of possession,.rights to' the -use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and
 
 *514
 
 acknowledged by the local customs, laws, and decisions of courts, the possessors and owners of such vested'rights shall be maintained and protected in the same.”
 
 *
 

 The right to water by prior appropriation, thus recognized and established as.the law of miners on the mineral lands of the public domain, is limited in every case', iu quantity and quality, by the uses for which the appropriation is made. A 'different use of the water'subsequently does not affect the right; that'is subject to. the same limitations, whatever thé use. The appropriation does not confer such au absolute right to the body of the water diverted that the owner can allow it, after its diversion, to run to wáste and prevent others from using it for mining or other legitimate purposes; nor does it confer such a right that he can insist upon the flow of the water without deterioration iu quality, where such deterioration does not defeat nor impair the uses tó which the water is applied.
 

 Such was the purport of the ruling of the Supreme Court of California in
 
 Butte Canal and Ditch Company
 
 v. Vaughn,
 
 †
 
 where it was held that the first appropriator had only the right to iusist that the water should be subject to his use and enjoyment to the extent of his original appropriation, and that its- quality should not be impaired so as to defeat the purpose of that appropriation. .To this extent, said the court,, his'rights
 
 go
 
 and no farther;, and that in subordination to tjiem subsequent appropriators may use the channel and waters of the stream, and mingle with its waters other waters, and divert them as often as they choose; that whilst enjoying his original rights the first appropriator had no cause of complaint. In the subsequent ease of
 
 Ortman
 
 v.
 
 Dixon,
 

 ‡
 

 the same- court held to the same purport, that' the measure of the right of the first appropriator of the water as to extent follows the nature of the appropriation or the uses for which it is taken.
 

 What diminution of quantity, or deterioration in quality,
 
 *515
 
 will constitute an invasion of the rights' of the first appropriator will depend upon the special circumstances of each case, considered with reference to the uses to which .the water is applied.. A slight deterioration in quality might render the water unfit"for drink or domestic purposes, whilst it would not sensibly impair its value for mining or irrigation. In all controversies, therefore, between him and parties subsequently claiming the .water, the question for determination is necessarily whether his use and enjoyment of the water to the extent of his original appropriation have been- impaired by the acts of the defendant.
 
 *
 
 But whether, upon a petition or bill asserting that his prior rights have been thus invaded, a court of-equity will interfere to restrain the acts of the party complained of, will depend upon the chavacter and extent of the injury alleged, whether it be irremediable in its nature, whether an aetion at law rvould afford adequate remedy, whether the parties are able to respond for the damages resulting from the injury, and other considerations which ordinarily govern a court of equity in the exercise of its preventive process of injunetion.-
 

 If, .now, we apply the principles thus stated to the present case, the question involved will be of easy solution. It appears from the evidence that there is at the point where the defendants work their mining claims only about two hundred inches of water in the creek, according to miners’ measurement; that between that point and the point where the Helena ditch taps the creek the-distance is about fifteen miles; and that between those points the creek is supplied by -several tributary streams of clear water, so that at the point .where the water is diverted its’volume amounts to about fifteen hundred inches. Of this water the Helena ditch' diverts five hundred inches, and conveys it nearly eighteen miles to the localities where it is sold. Running water has a tendency to clear'itself, and that result is often produced by a ffow of a 'few miles. But in this case the
 
 *516
 
 evidence shows that the water as it enters the Helena ditch is muddied and to some extent is affected by sand. At'the same time there is a great preponderance in the evidence to the effect that the deterioration in. quality from this circumstance.is very slight and does not render the water to any appreciable extent less useful of salable for mining purposes at the localities to which it is conveyed; .aud that no additional labor is required on the ditch on account of the mud-died condition of the water. There is also much doubt left by the evidence whether the saud carried into the ditch does not to a very great extent come from the hillsides lying between it and the mining of the defendants, or lying along the course of the ditch. A sand-gate at the head of the ditch is necessary^ whether there is or is not mining on the stream above; and the accumulation of sand from all sources, from the hillsides as well as from the-mining of the defendants, only requires the additional labor of one person ■for a few minutes each day. The injury thus sustained, and which is.only to a limited extent attributable to the mining of the defendants, if at all, is hardly appreciable in comparison with the damage which would'result to the defendants from the indefinite suspension óf work on their valuable mining claims. The defendants are als'o responsible parties, capable, according to the evidence, of answering for a damages which their mining produces, if any, to the plaintiff’s. Under these .circumstances we think there was no error in the refusal of the court below to interfere'by injunction to restrain their operations, arid in- leaving the plaintiffs .to their remedy, if any, by an action at law.
 

 "With respect to the water diverted by the Yaw-Yaw ditch, it is shown that its deterioration, so far as the deterioration exceeds that of the water in the Helena ditch, is caused by. sand and sediment brought by a tributary which enters the. creek below the head of the Hélena ditch.
 

 Decree affirmed.
 

 *
 

 4 Mason, 379.
 

 *
 

 3 Kent’s Commentaries, 439, side paging.
 

 *
 

 5 California, 140.
 

 *
 

 14 Stat. at Large, 253.
 

 †
 

 11 California, 143.
 

 ‡
 

 13 California, 33; see also Lobdell
 
 v.
 
 Simpson, 2 Nevada, 274.
 

 *
 

 This is substantially the rule laid down in Hill
 
 v.
 
 Smith, 27 California, 483; Yale on Mining Claims and Water Rights, 194.