Ross, J., dissenting.
As Iam unable to concur in the judgment of the court, or in the reasons given in support of it, I think it proper, in view of the great importance of the main question involved, to state the . grounds of my dissent.
In effect, the conclusion reached by the majority is, that the grantee of any legal subdivision of the public lands of the United States or of the state, through or along which a stream of water flows, is lawfully entitled — at least as against any. one not a riparian proprietor or previous appropriator—to have the water continue to flow in its natural channel undiminished in quantity and unaffected in quality. In other words, that as against such grantee there can be no such subsequent appropriation of any of the water of such stream as will reduce the natural flow in quantity, through however much public land the stream may flow before reach *443 ing the subdivision granted. This, of course, is conceding that the court below should have allowed the plaintiffs to have put in evidence their certificates of purchase, some of which antedated the appropriation under which the defendant claims, and concedes, further, that the certificates of purchase conferred upon the plaintiffs the same rights with respect to the water in question as would have been conferred by patents, and that the lands of the plaintiffs border upon the stream from which the diversion complained of is made; I assume all this because, from the view I take of the main question, those matters become immaterial. The validity of appropriations made prior to the grant from the state or the United States I understand to be conceded in the opinion of the majority. Although numerous contests with respect to water have arisen and been adjudicated by the Supreme Court of this state, as well as by the Supreme Court of the United States, neither court has heretofore been called upon to decide the precise question now at issue. But the principle which, in my opinion, should control its determination has been uniformly held by both tribunals. The doctrine that the water of a stream must continue to flow in its natural course undiminished in quantity has been so far modified in states with the climatic conditions of Massachusetts and Illinois as to permit the diversion of water for the purposes of irrigation, where the quantity of the stream is necessarily diminished by at least the quantity absorbed in the irrigation of the land upon which it is put. Especially should this be so in California, where, in a great part of the state, water is its very life blood. Every practical man must know that with the dry atmosphere and porous soils of those sections requiring irrigation, but little, if any, of the water diverted and used in irrigation is or can be returned to the stream from which it is taken. To establish, therefore, as the law of this state, that the water of a watercourse must flow on in its *444 natural channel undiminished in quantity would, in effect, be to convert the fertile fields, gardens, orchards, and vineyards in many and great sections of the state into waste and desert places. Such a rule is inapplicable to the condition of things existing here. The common law is supposed and- has been said- to be the perfection of human reason, but it would be the very reverse of this to hold that the waters of the streams of California must continue to flow in their natural channels until they sink into the sand or waste themselves in the sea, while orchards, vineyards, and growing crops of, immense, if not incalculable, value perish for thirst. In the case of People v. Canal Appraisers, 33 N. Y. 482, the Court of Appeals of New York quoted with approval this language of Judge Bronson: “I think no doctrine better settled than that such portions of the law of England as are not adapted to our condition form no part of the law of this state. This exception includes not only such laws as are inconsistent with the spirit of our own institutions, but such as were framed with special reference to the physical condition of a country differing widely from our own. It is contrary to the spirit of the common law itself to apply a rule founded upon a particular reason to a law when that reason utterly fails; cessante ratione legis, cessat ipsa lex.”
And in McClintock v. Bryden, 5 Cal. 100, S. C., 63 Am. Dec. 87, this court said: “The wants and interests of a country have always had their due weight upon courts in applying principles of law which should shape its conditions; and rules must be relaxed, the enforcement of which would be entirely unsuited to the interests of the people they are to govern.” In the case of Atchison v. Peterson, 20 Wall. 511, the Supreme Court of the United States held that, as respects the use of water for mining purposes throughout the Pacific states and territories, “the doctrines of the common law declaratory of the rights of riparian owners were, at an early day after *445 the discovery of gold, found to be inapplicable, or applicable only in a very limited extent, to the necessities of miners, and inadequate to their protection.” “By the common law,” said the court, “ the riparian owner on a stream not navigable takes the land to the center of the stream, and such owner - has the right -to the use of the water, flowing over the land as an incident to his estate. And as all such owners on the same stream have an equality of right to the use of the water as it naturally flows, in quality, and without diminution in quantity, except so far as such diminution may be created by a reasonable use of the water for certain domestic, agricultural, or manufacturing purposes, there could not be, according to that law, any such diversion or use of the water by one owner as would work material detriment to any other owner below him. Nor could the water by one owner be so retarded in its flow as to be thrown back to the injury of another owner above him.” In the subsequent case of Basey v. Gallagher, 20 Wall. 682, the court held that the views expressed and rulings made in the case of Atchison v. Peterson “are equally applicable to the use of water on the public lands for purposes of irrigation.”
It has never been held by the Supreme Court of this state that the waters of the non-navigable streams of-the state are not subject to diversion for the purposes of irrigation. On the contrary, the right so to divert them has been frequently upheld. The latest case upon the subject is that of the Anaheim Water Company v. Semi-Tropic Water Co., 64 Cal. 185.
In the case at bar no question arises as to the rights of grantees of Spanish or Mexican grants or their successors in interest, through or along whose land a stream of water flows, either as between themselves or others. The question here is between a purchaser of a part of the public land of the state, derived from the United States, and an appropriator of water upon the public *446 lands of the United States. From the foundation of the state, waters pertaining to the public lands of both the federal and state governments have been appropriated and used for mining, agriculture, and other useful purposes. Such appropriation and use was first sanctioned by custom, next by the decisions of the courts, and finally by legislative action on the part of the United States as well as the state. It thus became a part of the law of the land, of which every citizen was entitled to avail himself, and of which every purchaser from the United States, as well as the state, was bound to take notice. In protecting, therefore, the rights of the appropriators of water upon the public lands of the state and of the United States, no wrong is done to the purchasers from either government. That from the very beginning it has been the custom of the people of the state to divert from their natural channels the waters of the streams upon the public lands, and appropriate the same to the purposes of mining, agriculture, and other useful and beneficial uses, is a part of the history of the state. That such diversions and appropriations have been from the earliest times recognized and sanctioned by the supreme court of the state is equally true. Numerous cases attest this fact: Irwin v. Phillips, 5 Cal. 140; S. C., 63 Am. Dec. 113; Tartar v. Spring Creek Water and Mining Co., 5 Cal. 397; Conger v. Weaver, 6 Cal. 555; S. C., 65 Am. Dec. 528,—are among the earliest. In Hill v. King, 8 Cal. 338, Chief Justice Murray, who dissented in Conger v. Weaver, supra, used this language: “The right to appropriate the waters of the streams of this state, for mining and other purposes, has been too long settled to admit of any doubt or discussion at this time. Some of the older English authorities held that a right to water might be acquired by a riparian appropriator by appropriation, and this court might with propriety have maintained the rights of water companies on the ground that they were riparian owners, but it has based this *447 right on the ground that the legislation of the state has given to every one, not only a privilege to work the ‘gold placers/ but also to divert the streams for this and other purposes. The legislation of the state has been held to amount to a ‘general license to all’ (whether properly is not for me to say, the point having been decided by a majority of the court against my own opinion, —see Conger v. Weaver, October 2,1856, 6 Cal. 548; S. C., 65 Am. Dec. 528); and when these ditches have been constructed, they are regarded as a franchise or easement, belonging to the proprietors, and are entitled to protection as any other property.” In Irwin v. Phillips, supra, after stating that a' system of rules had been permitted to grow up with respect to mining on the public lands by the voluntary action and assent of the population, whose free and unrestrained occupation of the mineral region had been tacitly assented to by the federal government, and heartily encouraged by the expressed legislative policy of the state, the court said: “So fully recognized have become these rights, and without any specific legislation conferring or confirming them, they are alluded to and spoken of in various acts of the legislature in the same manner as if they were rights which had been vested by the most distinct expression of the will of the law-makers.” The California Reports abound with cases to the same effect: McDonald v. Bear River Co., 13 Cal. 232; Ortman v. Dixon, 13 Cal. 38; McKinney v. Smith, 21 Cal. 381; Smith v. O’Hara, 43 Cal. 374; N. C. & S. C. Co. v. Kidd, 37 Cal. 314, and Rupley v. Welch, 23 Cal. 455,—are among them.
It is true that in none of these cases was it a question of right between a grantee of either the federal or state government and an appropriator of the waters. But the cases are cited to show that from the foundation of the state government the people of the state have been accustomed to do that which, according to the rule of the common law, they could not have done, namely, to divert *448 and appropriate the waters of the streams flowing over the public lands, for the purposes of mining, agriculture, and other beneficial uses; that this custom, which is wholly at variance with the accepted principles of the common law, has been from its very beginning acquiesced in by the state government,—has been, as said by this court in 1855 in the case of Irwin v. Phillips, 5 Cal. 140, S. C., 63 Am. Dec. 113, heartily encouraged by the express legislative policy of the state, and has all along been recognized, sanctioned, and confirmed by the highest judicial tribunal of the state. Not only this, but the federal government, first by its silent acquiescence, and afterwards by express statutory enactment, assented to this departure from the principles of the common law with respect to the water of the public lands in California. And it did so for the same reasons and in much the same way that the state of California assented to it. Allusion has already been made to the case of Atchison v. Peterson, in which the Supreme Court of the United States said that, as respects the use of water for mining purposes in California, “the doctrines of the common law declaratory of the rights of riparian owners were, at an early day after the discovery of gold, found to be inapplicable, or applicable only in a very limited extent, to the necessities of miners, and inadequate to their protection”; and also to the subsequent case of Basey v. Gallagher, in which the same learned court declared that the views expressed and the rulings made in Atchison v. Peterson are equally applicable to the use of water on the public lands for purposes of irrigation. In Broder v. Water Company, 101 U. S. 276, which is also a California case, the Supreme Court of the United States said: “It is the established doctrine of this court that rights of miners who had taken possession of mines and worked and developed them, and the rights of persons who had constructed canals and ditches to be used in mining operations and for purposes of agricultural irrigation in the region where such arti *449 fiel al use of the water was an absolute necessity, are rights which the government had by its conduct recognized and encouraged, and was bound to protect, before the act of 1866,”—referring to the act of Congress of July 26, 1866, the ninth section of which contains this declaration: “That wherever by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals, for the purposes aforesaid, is hereby acknowledged and confirmed.” And the court added: “We are of opinion that the section of the act which we have quoted (the ninth) was rather a voluntary recognition of a pre-existing right of possession, constituting a valid claim to its continued use, than the establishment of a new one.”
The court accordingly, in the Broder case, without regard to the act of 1866, protected the right of the defendant to divert the water there in question from its natural channel, upon the ground that the government had, by its conduct, recognized and encouraged, and was bound to protect such diversions. It seems to me, therefore, that this court, in the late case of Osgood v. Water and Mining Company, reported in 56 Cal. 571, was entirely justified in saying, as it did, that “ the principle of prior appropriation of water on the public lands in California, where its artifical use for agricultural, mining, and other like purposes is absolutely essential, which has all along been recognized and sanctioned by the local customs, laws, and decisions, was thus expressly recognized and sanctioned by the Supreme Court of the United States, and also by the act of Congress of 1866. ” It was this principle, and nothing else, that secured the defendant in the case of Broder v. Water Company, 101 U. S. 276, *450 in the continued enjoyment of the water it had appropriated as against a grant from the government antedating the act of 1866, for the court in terms declares: “We do not think that the defendant is under the necessity of relying on that statute. ” The defendant had acquired the right to divert the water from its natural channel and appropriate it to a useful purpose, because the government by its conduct through a long series of years, in view of the necessities of the country, which were widely different from those of the country from which the common law was taken, had recognized and encouraged such diversions and use of the waters upon the public lands. The government permitted the principle of appropriation of such waters to grow up and become a part of the law in relation to the public lands, and therefore, in construing the grant from the government, the court considered it with reference to the principle of appropriation, and protected the rights of the defendant which arose under and by virtue of that principle. The common-law doctrine of riparian rights being wholly inconsistent with and antagonistic to that of appropriation, it necessarily follows that when the federal and state governments assented to, recognized, and confirmed, with respect to the waters upon the public lands, the doctrine of appropriation, they in effect declared that that of riparian rights did not apply. The doctrine of appropriation thus established was not a temporary thing, to exist only until some one should obtain a certificate or patent for forty acres or some other subdivision of the public land bordering on the river or other stream of water. It was, as has been said, born of the necessities of the country and its people, was the growth of years, permanent in its character, and fixed the status of water rights with respect to public lands. No valid reason exists why the government, which owned both the land and the water, could not do this. It thus became, in my judgment, as much a part of the law of the land as if it *451 had been written in terms in the statute-books, and in connection with which all grants of public land from either government should be read. In the light of the history of the state, and of the legislation and decisions with respect to the subject in question, is it possible that either government, state or national, ever contemplated that conveyance of forty acres of land at the lower end of a stream that flows for miles through public lands should put an end to subsequent appropriation of the waters of the stream upon the public lands above, and entitle the grantee of the forty acres to the undiminished flow of the water in its natural channel from its source to its mouth ? It seems to me entirely clear that nothing of the kind was ever intended or contemplated. ^ Of course, the doctrine of appropriation, as contradistinguished from that of riparian rights, was not intended to, and indeed could not, affect the rights of those persons holding under grants from the Spanish or Mexican governments: first, because the doctrine is expressly limited to the waters upon what are known as the public lands; and secondly, because the rights of such grantees are protected by the treaty with Mexico and the good faith of the government.
It is the rights of such riparian proprietors as those that are unaffected by the doctrine of appropriation, and those are the riparian rights that are excepted from the operations of the provisions of the Civil Code in relation to “water rights” by section 1422 of that code, which reads: “The rights of riparian proprietors are not affected by the provisions of this title.” That code, as well as the other codes of California, went into effect the first day of January, 1873. The appellants contend, and the prevailing opinion holds, that by the section of the Civil Code just quoted, the legislature of the state declared that the common-law doctrine of riparian rights should apply to all the streams of the state. It seems very clear to me that this is not so, for many reasons. *452 Leaving out of consideration the question whether it lay in the power of the state to nullify the doctrine of appropriation established by the United States with respect to the waters flowing over their lands,—established, too, in pursuance of the policy the state itself had previously adopted, and for the advancement of the interests of the people of the state,—I find nothing in the Civil Code, or in any of the other codes, to indicate any intention on the part of the legislature of the state to return to the doctrine of riparian rights with respect to the waters upon the public lands. On the contrary, the code enacts in statutory form, in language as clear as language can be made, the theretofore prevailing law of appropriation. Title 8 of the Civil Code is headed “Water rights." The first section of that title—section 1410 of the code —declares: “The right to the use of running water, flowing in a river or stream, or down a cañón or ravine, may be acquired by appropriation."
Can anything be clearer? By the common law, the water flowing in a river or stream, or down a cañón or ravine, could not be acquired by appropriation, and must continue to flow in its natural channel undiminished in quantity and unaffected in quality. Could there be any clearer declaration of the fact that the common-law doctrine of riparian rights should not apply to the streams of this state than is found in this declaration of the statute that the waters of such streams may be acquired by appropriation? The statute proceeds:—
“Sec. 1411. The appropriation must be for some useful or beneficial purpose, and when the appropriator or his successor in interest ceases to use it for such a purpose, the right ceases.
“ Sec. 1412. The person entitled to the use may change the place of diversion, if others are not injured by such change, and may extend the ditch, flumes, pipe, or aqueducts by which the diversion is made to places beyond that where the first use was made.
*453 “Sec. 1413. The water appropriated may be turned into the channel of another stream and mingled with its water, and then reclaimed; but in reclaiming it the water already appropriated by another must not be diminished.
“ Sec. 1414. As between appropriators, the one first in time is the first in right.”
Next follows sections providing the manner in which appropriations shall be made.
Sec. 1420 provides that “ persons who have heretofore claimed the right to water, and who have not constructed works in which to divert it, and who have not diverted nor applied it to some useful purpose must, after this title takes effect, and within twenty days thereafter, proceed as in this title provided, or their right ceases”; and the last section of the title—1422—is the one already quoted, and reads: “The rights of riparian proprietors are not affected by the provisions of this title.”
The construction claimed by appellants, and in the prevailing opinion given of this last section, in effect wipes out all the provisions of the title, to which it is but a saving clause. This is reversing the established rule of construction as I understand it. To my mind nothing is clearer than that, by the provisions of the code referred to, the legislature continued in existence the pre-existing law with respect to the appropriation of waters upon the public lands; and as both the federal and state governments, in the exercise of a policy eminently wise and just, substituted the doctrine of appropriation for the riparian doctrine, so far as the public lands and the waters pertaining thereto are concerned, the only riparian proprietors to which the saving clause can apply are such as hold under grants from the Spanish or Mexican governments; in other words, in adopting the provisions of the Civil Code in question, the legislature did but codify the pre-existing law upon the subject.
From the views I entertain upon the main proposition in the case, the other questions discussed by coun *454 sel, and in the prevailing opinion, become unimportant. In my opinion, the order appealed from should be affirmed, and I therefore dissent from the judgment given here.