THOMAS F. LANE

*v.*

DAVID M. SMYTHE et al.

The publisher of a newspaper called *The Summit Record*, published at Summit, became financially embarrassed, suspended its publication, and sold the plant to a person who held a chattel mortgage upon it, who, within a month, leased the plant by written contract to the defendant for one year. The contract contained a recital that the plant had been used in the publication of the *Summit Record*, and a covenant on part of defendant to use it for the purpose of continuing such publication, and to redeliver it at the end of the term. No express mention was made of the good-will or right to use the name and title *"Summit Record."* Defendant took possession under the lease and resumed the publication by the same title, numbering his first issue Vol. 3, No. 1—inserting in it a leading article stating, in substance, that his paper would be a continuation of the former publication—and continued the publication for over four years without changing the relations arising out of the lease. The title of the landlord in the lease and reversion became vested in complainant, who put an end to the lease, demanded and received from defendant the possession of the plant, and commenced the publication of a paper by the same name at the same place.—*Held*, that the right to publish a newspaper by the name *"Summit Record"* was, by the contract and conduct of the parties, made an appurtenant to the plant and became vested in complainant, and that equity would restrain defendant from continuing the publication of a paper by that name.

On order to show cause why injunction should not issue.

Heard on bill, answer and affidavits.

The contest is over the right to publish a newspaper with the name and title *"Summit Record,"* at Summit, Union county, New Jersey. The following facts appear :

About January 1st, 1883, one Woodruff started a weekly newspaper at Summit, and named it *"The Summit Record."* Those words were printed in large old English type at the head of the first page ; beneath, in smaller capitals, were the words, *"Independent, Just and Fearless."* Woodruff continued the pub-

lication until some time in the latter part of the month of November, 1884, when he was obliged, by pecuniary straits, to suspend. The newspaper plant was mortgaged to one DeForest. On December 1st, 1884, Woodruff conveyed the plant to DeForest by a bill of sale, describing it as follows :

"All and singular, the goods and chattels mentioned in the schedule here-unto annexed and now in the rooms on the upper floor of the building known as 'Littell's Hall,' situated in the said township of Summit, in the county of Union and State of New Jersey aforesaid, subject to a mortgage of one thou-sand dollars given by said Newton Woodruff to William H. DeForest."

The schedule comprises a long list of chattels, such as are used in printing and publishing an ordinary country newspaper, and ends thus :

"And all other goods, chattels, fixtures, furniture, stock, and all and every other article or thing belonging to me and used and employed in the printing (*sic*) or otherwise and now contained in said rooms and premises on the top floor of 'Littell's Hall,' in the township of Summit aforesaid."

Both Woodruff and DeForest swear that it was understood and agreed between them that what is called the good-will of the newspaper, the right to continue its publication by its old name and the subscription and advertising lists and patronage, went with the plant to DeForest.

On the 16th of December, 1884, DeForest, as party of the first part, and the defendant, Smythe, as party of the second part, executed in duplicate a lease and agreement of that date, by which it was witnessed that DeForest—

"by these presents doth grant and let unto the said party of the second part, all those printing presses, paper and card-cutters, type and other goods and chattels particularly mentioned and specified in the schedule hereto annexed, and now contained and being in the rooms on the upper floor of the building known by the name of and generally called 'Littell's Hall,' situated in the township of Summit aforesaid, and formerly occupied by Newton Woodruff in the publication of the '*Summit Record*,' and any and all other goods and chattels therein contained conveyed to the said William H. DeForest by the said Newton Woodruff or intended so to be by bill of sale bearing date the first day of December, A. D. 1884, for the term of one year from the sixteenth day of December, one thousand eight hundred and eighty-four, at the yearly rent or sum of ninety dollars. * * *

"And it is understood by and between the said parties hereto that the said party of the second part is to use the said goods and chattels in the business of the publication of the '*Summit Record*,' and for general job printing purposes. * * *

"And it is mutually understood and agreed by and between the said parties hereto, that in case, at the expiration of three months from the date hereof, the said party of the second part shall be unable to continue the business of the publication of the '*Summit Record*' and general job printing, he shall and may have the privilege, if he elects so to do, of giving up and surrendering this lease and all his interest herein, upon first giving to the said party of the first part ten days' notice, in writing, of his intention so to do. And the said party of the first part does hereby agree, from and after said expiration of said three months, to release the said party of the second part from the payment of any rent for the balance of the said term herein mentioned, only, however, upon condition that the said party of the second part shall be unable to continue the said business as aforesaid."

There was also a provision for the return of the goods at the termination of the lease, and also for their purchase by Smythe, at his option, at a price to be agreed upon.

The schedule is the same as that attached to Woodruff's bill of sale, and ends thus:

"And all other goods, chattels, fixtures, furniture, and all and every other *article and thing* conveyed as aforesaid by the said Newton Woodruff to the said William H. DeForest, and now contained in said rooms in 'Littel's Hall,' formerly occupied by said Newton Woodruff as aforesaid."

Smythe commenced the publication of a newspaper at Summit on December 20th, 1884, entitled "*Summit Record*," the motto of which was placed beneath both the title and the date, and was, "Devoted to the Best Interests of the People and the Advancement of Democratic Principles." The type of the words "*Summit Record*" was precisely similar, both in size and character, to that used by Woodruff in the title of his paper.

Smythe's first issue was numbered "Volume 3, No. 1."

A copy of Woodruff's paper of October 25th, 1884, was produced by the defendant, and bears the number "Volume 2, No. 43."

The leader in the editorial column of Smythe's first issue, a copy of which was also produced by him, was as follows:

"The SUMMIT RECORD is before you this morning with a general change in the office employees, the editor and the general management of the paper.

"The RECORD and general business of the office has been sold to D. M. Smythe, who will hereafter manage the paper and the business connected therewith. In the purchase, the present publisher does not assume the unfulfilled subscription and advertising contracts entered into with the retiring editor and publisher."

In that issue appear several legal advertisements. No entry was made at the post-office by Smythe of his paper, as required when a new newspaper is started, but it was deposited and sent as second-class matter as a continuation of the old paper. Smythe continued to publish the paper under the foregoing lease and agreement regularly, and still continues it. He did not purchase the plant from DeForest, nor did he at any time do anything to change the relations between himself and DeForest arising out of the lease and contract.

In August, 1889, whatever title DeForest had in the lease, name and good-will of the newspaper and plant, became vested in the complainant. He at once demanded possession of the plant and establishment. The defendant delivered up to him what remained of the plant, but declined to deliver the title plate then in use.

Complainant, on September 14th, served on defendant the following notice:

"*To David M. Smythe:* Please take notice that the lease made by William H. DeForest to you, dated December sixteenth, eighteen hundred and eighty-four, has been duly assigned to me by George R. Sheldon, assignee of William H. DeForest, and also assigned to me by the said William H. DeForest; that the paper known as the *Summit Record* and the right to publish the same has been sold to me by the said George R. Sheldon, assignee, and by the said William H. DeForest; that by virtue thereof I am now the owner of the said paper, the *Summit Record,* and the right to use the said name in the publishing of a newspaper, and that I am also the owner of all the rights of the said William H. DeForest or of George R. Sheldon, assignee, under said lease; that by virtue of the covenants in the said lease and my rights as aforesaid, I declare the said lease at an end; I demand the delivery of the plate used in publishing the *Summit Record* upon which the name of the said paper *Summit Record* is engraved, and I forbid you and all other persons to use the name *Summit Record,* or any name similar thereto, in the publishing of a newspaper

Lane *v.* Smythe.

:at Summit, or at any other place within this state. Dated September fourteenth, ·eighteen hundred and eighty-nine.

" (Signed,) THOMAS F. LANE."

Defendant refused to comply with the complainant's demand, .and said he would contest complainant's right in the courts. ·Complainant himself at once commenced the publication of a newspaper entitled *"The Summit Record,"* and, on the 5th of ·October last, filed his bill, setting forth the foregoing facts and praying that the defendant may be enjoined from further publishing a newspaper under the name of *"Summit Record,"* and from taking from the post-office mail matter addressed to *"The Summit Record"* or *"Summit Record."*

The bill also alleges that the defendant is a man of no pecuniary responsibility.

Upon filing this bill, with affidavits in its support, an order was made on the defendant Smythe to show cause, on October .21st, why an injunction should not issue according to the prayer ·of the bill.

Smythe answered, admitting the previous publication of " *The .Summit Record* " by Woodruff, alleging that the last issue published was on November 22d, 1884, and that its publication was ·abandoned by Woodruff; denying that the sale from Woodruff . to DeForest included the right to use the name " *The Summit Record"* or any good-will ; alleging that he leased from DeForest only the printing plant, and not any good-will or the right to use any particular name, and that the name " *Summit Record,"* without the particle " The," was adopted by him as a new name, :and filled in the lease after that instrument was prepared.

Defendant further denies that he has ever admitted that the newspaper was rented by him from DeForest, or that he did in fact do so.

No proof was offered in support of the allegation, in the leader ·of Smythe's first issue, that the newspaper and general business of the office had been *sold* to him, nor was any explanation made ·of the statements of that article.

The answer substantially admits that Smythe is a man of no pecuniary responsibility.

*Mr. Adrian Riker,* for the complainant.

*Mr. Joseph Alward,* for the defendant.

PITNEY, V. C.

The defendant's defence is rested mainly on the proposition that Woodruff's paper, " *The Summit Record,*" ceased to exist and died of poverty, and without any good-will, in November, 1884, and that he, on December 20th, 1884, started an entirely new newspaper under a new name, namely, " *Summit Record,*" with a new motto, and that he obtained by, and enjoyed under, the lease nothing but the bare plant. I think this theory of the case is not only not sustained, but is completely overthrown by the admitted facts. An examination of the two executed copies of the lease and agreement between DeForest and Smythe, which were handed up to the court on the argument, show that the words " *Summit Record,*" wherever they occur in the agreement, were written at the same time, by the same hand and in the same ink as the context. One of the copies was evidently prepared by the counsel or scrivener who transacted the business, and the other was copied from it by a clerk. The same mode of writing the words, by including in the quotation marks only the words " *Summit Record,*" was adopted in the first part of the instrument, in speaking of the newspaper formerly published by Woodruff, as is used in the latter part, providing for its continued publication by Smythe. The name is the same in each instance.

This proves, to my satisfaction, that the origin of the change from " *The Summit Record* " to " *Summit Record,*" was in the probably accidental exclusion of the particle " The " from the quotation marks in preparing the instrument. The draftsman no doubt found it awkward to write " the ' *The Summit Record* ' "—or he may not have been aware at the moment that the particle in question was found in the title of the paper. But I do not think that the difference between the two titles is sufficient of itself to sustain defendant's contention of a lack of identity in the names. The authorities all agree that such a

difference is not sufficient to make a distinction. The mottoes do not appear to form a part of the title of the paper. It is perfectly apparent, by a comparison of the two copies handed up, that the title of Smythe's paper was intended to be substantially the same as that of Woodruff's.

Then we have the significant statement, found in the leader of Smythe's first number, and the numbering it "Volume 3," which is, in my judgment, entirely inconsistent with the notion of starting a new newspaper. The article in question is one continued admission that his paper was a mere continuation of the former publication, with a change only in the "*office employees, the editor and the general management of the paper,*" disavowing liability for the unfulfilled subscription and advertising contracts of "*the retiring editor and publisher.*" "*The retiring editor and publisher*" of what newspaper? And why, if it was a new newspaper, disavow liability for the unfulfilled contracts of the previous "*editor and publisher?*"

Then, as to the good-will and business and establishment generally, and the right to continue the paper by the same name. The allegation that the "*'Record' and general business of the office has been sold to D. M. Smythe*" renders it simply impossible for him now to say that he did not receive with the plant leased from DeForest, as an appurtenant to it, the name, good-will and business establishment of the newspaper published by Woodruff, and the right to continue its publication. Those words were written and published by him at a time when he knew precisely what he had so received and was in possession and enjoyment of.

The allegation of *purchase* and *sale* of the establishment and business was without the least foundation in fact. There is no pretence of it anywhere in the answer or affidavits, and the defendant is not entitled to the benefit of such allegation for present purposes, as a qualification of his admissions. From whom did he *purchase* the business and establishment? Clearly, if he obtained it or received it from any person, it came from DeForest, as an appurtenant to the plant.

Then it further appears that Smythe treated his paper as a continuation of the former publication, by sending it through the

29

mails as second-class matter, without making the entries at the post-office necessary for a new paper, and by publishing legal notices, which can only be published by an old-established paper.

The act of April 17th, 1884 (*P. L. of 1884 p. 222; Rev. Sup. p. 768*), in force when Smythe took possession, provides that any newspaper which has been published for twelve months consecutively shall be deemed a legal newspaper of the state for the purpose of the publication of legal notices; and on the same page of the *Revision* is found an act providing for the continued legal life of a newspaper whose publication has been temporarily suspended. Smythe's paper would not have been a "legal newspaper" and entitled to publish legal notices if it had not been a continuation of Woodruff's paper.

The language and frame of the lease also supports this view. The plant leased was apparently a complete newspaper equipment and plant, and was so treated by the parties. It was in a room where it had been used in publishing a particular newspaper, and was so described. The lessee agreed that it should be used in publishing that very newspaper, with the privilege of surrendering the lease if he were unable to continue such publication. Now, although the good-will and business is not mentioned in express words, yet, it seems to me, it was necessarily implied from these clauses. And, upon the whole case, it seems clear enough that the right to continue the publication of the paper by its old name and the good-will was treated by the parties as an appurtenant to the plant. Smythe took possession under that instrument, and received and enjoyed the benefits of the name and patronage of the paper, and, it seems to me, it is therefore of no importance to inquire whether such good-will and right to use the name in question passed from Woodruff to DeForest. Smythe received and enjoyed this notional property as tenant and bailee of DeForest, and is estopped from denying his landlord's title.

But counsel for defendant further insists that, admitting all this, still he did not by his lease agree to surrender up to DeForest, at the end of the term, the good-will and business of the newspaper, and the right to use the name, and to continue to publish

the newspaper, but only the actual tangible chattels enumerated in the schedule; that the name and good-will, and right to continue the publication, were not annexed to the tangible chattels, but could, and did, exist separate therefrom.

The precise question thus raised was considered and decided adversely to the defendant in *Boon* v. *Moss, 70 N. Y. 465.* That was a suit by one of two partners against the other for a dissolution and settlement. A receiver was appointed. The firm was engaged in printing and publishing two newspapers—a weekly and daily—namely, " *The Watertown Weekly Reunion,"* and the *"Morning Dispatch."* The weekly had been previously printed and published by one Hall, who owned the establishment and plant. In September, 1870, Hall entered into a contract with one Warren by which, for the consideration of $10,000, payable mainly in installments, he contracted to sell to Warren

" *The Watertown Reunion* printing establishment, including the presses, machinery, type of all descriptions, newspaper and jobbing material, tools, implements, etc., appertaining to the said printing business, excepting real estate and accounts, notes and demands due said party of the first part. The party of the second part to have full ownership when the conditions and stipulations of this agreement are fully performed."

The contract contained these clauses :

"And it is further agreed that the party of the second part (Warren) has the right, under this agreement, to take possession of the said printing establishment, material and property, *and use and occupy the same for carrying on the said printing business,* on the tenth day of September, instant, and of the newspaper type material on the eighth of September, aforesaid, as *tenant* or *bailee* of the party of the first part, and *continue so to use and occupy* the same until the fulfillment of all the stipulations of this agreement, or forfeiture of same stipulation in this agreement to be observed by the party of the second part, in which case the said party of the first part may repossess himself of the same.

"And it is further agreed that the property herein mentioned, and all property substituted for the same, or any part thereof, shall be kept together in the city of Watertown, and used in a prudent and careful manner for printing purposes only, and kept in as good condition and of equal value as the same now is."

Warren immediately sold his rights under the contract to Moss and Boon, and they assumed Warren's obligations and took pos-

session, and continued the publication of the weekly, and two·
years afterwards started the daily paper.   Hall, the original pro--
prietor, sold his interest in the contract to one Flower.   In 1874,
and before all the payments under the contract were made, but after
the plant had been much enlarged by Boon and Moss, the dissolu-
tion suit was commenced, and on February 15th, 1874, the re-
ceiver was appointed, who was authorized by the court to continue·
the publication of the papers.   In March, 1874, Flower, as
assignee of Hall, demanded possession from the receiver of the·
plant under his agreement.   Such proceedings were had upon
this demand that so much of the then existing plant as was cov-
ered by the contract was, by order of the court, delivered to·
Flower, and the receiver sold the good-will and subscription list
of both papers for $7,000.   Flower claimed, in writing, that
the good-will and subscription lists of the *" Weekly Reunion"*
belonged to him, as assignee of Hall, and demanded them of the
receiver before the sale, and afterwards demanded compensation
therefor out of the proceeds of the sale.   This demand was re-
ferred to a referee, who decided in Flower's favor and reported.
that he was entitled to $3,000 out of the proceeds of the sale of
the good-will as the value of the good-will of the weekly paper..
A single judge of the supreme court, at special term, reversed
this report, but the general term of the supreme court, and the
court of appeals, affirmed it unanimously on the opinion of
Chief-Justice Church as reported.

It will be observed that in that case, as in the one in hand,.
the only thing expressly mentioned was the tangible materials
and plant with the additional word "establishment."   And the
only question is, whether that word, found in the New York
case, and wanting in the present case, can prevent the reasoning
of that case from applying to this.   The force of the word
" establishment" in that connection may be construed by impli-
cation to include the good-will and the right to use the name of
the paper.   And such seems to be the force given to it by Chief-
Justice Church in his opinion.   He says, on *p. 473:* " It cannot
be doubted that the good-will of the establishment was embraced'
in the sale.   Although not *specifically* mentioned, it constituted.

an element of value. The language could not be more comprehensive. '*The Watertown Reunion* establishment, including presses, type,' etc., necessarily covered everything of advantage pertaining to the business, and, notably, the subscription list, name of the paper and other advantages incident to the property. Hall transferred, conditionally, all that he owned belonging to the establishment, and Warren succeeded to all his rights in the same, subject to the terms of the contract."

At *p. 474*, he says: "There is one kind of good-will, which has been said to be only a probability, that customers will resort to the old place; and another, far more valuable, when a retiring partner agrees not to engage in the same business in competition with the old establishment. The good-will of a permanent newspaper establishment is generally more tangible than either. The vendor, Hall, would not have been permitted to appropriate the subscription list and *name* of the paper to his own use, for the reason that he had sold it, although he might, perhaps, have printed another newspaper at the same place.　＊　＊　＊

" The condition applied to all the property sold, including the good-will. Everything sold was intended to be held to secure the purchase-money."

And again, at *p. 475:* "I am of the opinion that the sale from Hall to Warren was conditional; that it embraced the subscription list and good-will of the establishment, and that Flower was entitled thereto until his debt was paid; and, it having been sold, that he is entitled to its value to the extent of paying his debt. This is the legal result—and it is just."

The lease, in the case in hand, provided for the return of the plant to DeForest at its termination. Smythe recognized the present binding force of this provision, and complainant's position as assignee of DeForest, by returning to him the remains of the plant.

As already shown, the actual understanding between DeForest and Smythe was, that the right to use the name "*Summit Record*" and to continue the publication of that newspaper, together with its good-will, passed from DeForest (landlord) to Smythe (tenant and bailee) as appurtenances to the plant, and that was the prac-

tical construction put upon the contract and transaction by the parties. The title to these appurtenances never passed from DeForest to Smythe, and were never separated from the plant. But the latter (as in *Boon* v. *Moss*) continued to be the tenant and·bailee of them. It follows, inexorably, from these premises, that when Smythe recognized the complainant as the assignee of DeForest and surrendered to him the plant held by him under the lease, he also surrendered with it the appurtenant right to continue the publication of the paper, with its title and good-will. I do not see how it is possible to escape this conclusion. Suppose Smythe had surrendered the plant at the end of three months or of the year fixed in the lease, could it be pretended that he could have retained the right to continue the publication of the paper by its name? And if not at the end of the year, then why at the end of five years, the relations of the parties remaining unchanged?

I am, therefore, of opinion, that the good-will and right to use the name and continue the publication of the paper was, under the circumstances, annexed to the plant, and went with it to the complainant. This may seem hard upon Smythe, but he had the same opportunity to purchase DeForest's rights that the complainant had, but did not see fit to avail himself of it. He occupied the position of tenant and bailee of DeForest, precisely as Boon & Moss did of Warren in the New York case.

If, then, the complainant, by his purchase from DeForest, acquired the right to publish a newspaper by the name of *"The Summit Record"* as a continuation of the paper previously published by that name, it would seem to follow, conclusively, that the defendant cannot also publish a newspaper by that name at Summit. The right in such case is necessarily exclusive. Its value consists in its exclusiveness. It has been ordinarily rested upon the same ground as the right to ordinary trade-marks. But I think it may be well placed higher. The newspaper is an established institution of modern society. It supplies an absolute need or want. Society could not get on without it. Among its requisites are that it should have continuity, and, to that end, a name by which it is known, and which gives it identity and

enables it to have continuity independently of its ownership. Though established without the aid of any statute, yet it has a sort of independent entity or existence known and recognized by the law, as well the unwritten as the written. Newspapers are constantly used as a vehicle of legal advertisement by their recognized names. It would be highly inconvenient and decidedly against public policy that there should be two newspapers of the same name published in the same neighborhood. Such duplicate publication would produce confusion and uncertainty in many directions.

Judge Brady, in *Matsell* v. *Flanagan, 2 Abb. Pr. (N. S.) 459,* in an action brought by the proprietor of *"The National Police Gazette"* to restrain the defendant from publishing a newspaper under the name of *"The United States Police Gazette,"* uses this language: "The enforcement of the doctrine that trademarks shall not be similated does not depend entirely upon the alleged invasion of individual rights, but as well upon the broad principle, that *the public are entitled to protection from the use of previously appropriated names* or symbols in such manner as may deceive them by inducing or leading to the purchase of one thing for another." And he held that the name of the defendant's paper was so much like that of the complainant's that the defendant should be restrained from publishing it by that name.

The consideration of the public inconvenience is over and above that of private right, which, however, seems to be equally clear. Hence, it has long been well settled, that if one person adopt and appropriate a particular name for a newspaper, and actually and in good faith commence its publication, it will be unlawful for another person to use the same name in the publication of another newspaper in the same neighborhood. *Longman* v. *Tripp, 5 Bos. & P. 67; Hogg* v. *Kirby, 8 Ves. 213, 215; Edmonds* v. *Benbow, Seton Dec. 905; Prowett* v. *Mortimer, 2 Jur. (N. S.) 414; Bradbury* v. *Dickens, 27 Beav. 53, 28 L. J. (N. S.) 667; Ward* v. *Beeton, L. R., 19 Eq. Cas. 207; Clement* v. *Maddick, 1 Giff. 98, 5 Jur. (N. S.) 592, per* V. C. Stuart; *Ingram* v. *Stiff, 5 Jur. (N. S.) 947,* on appeal from Wood, V. C., before Knight, Bruce and Turner, L. JJ.; *Dayton* v. *Wilkes, 17 How. Pr. 510.*

For a clear statement of the principle upon which the courts proceed in such cases, see the very recent case of *Borthwick* v. *The Evening Post, L. R., 37 Ch. Div. (1888) 449.* All the judges there agree that the courts act on the ground of an injury to a property right, and that fraud is not necessary.

For a discussion and consideration of conflicting claims by two parties to the use of the same name for a periodical to be started about the same time, see *Maxwell* v. *Hogg,* and *Hogg* v. *Maxwell, L. R., 2 Ch. App. 307,* and *Licensed Victualler's Newspaper Company* v. *Bingham, L. R., 38 Ch. Div. 139.* For the French cases upon this subject, see *Browne Tr. M.* §§ *415–417.*

My conclusion in this case is reached upon consideration of the case made by the defendant in his answer, affidavits and exhibits, and, of course, under these circumstances, it is not to be presumed or supposed that his case can be altered or improved upon final hearing. Upon the case, as he has made it in his answer and proofs, it seems to me that the complainant's right is reasonably clear and free from doubt. It is equally clear, that damages to be recovered at law would not afford adequate compensation to the complainant, and that the injury which will be inflicted upon him by a continuation of defendant's publication will be, in legal contemplation, irreparable. There is here an actual invasion and appropriation of complainant's property. *Kerr Inj. 191, 200, 225, 474, 478; 2 High Inj.* §§ *988, 1099.*

Besides, we have the element of want of pecuniary responsibility on the part of the defendant, which is proper to be considered in a case like this. *West* v. *Walker, 2 Gr. Ch. 279, note b, p. 290,* and cases there cited. *Atchison* v. *Peterson, 20 Wall. 507, 515; Smallman* v. *Onions, 3 Bro. Ch. 621.*

The complainant is entitled to an injunction restraining the defendant Smythe from further publishing a newspaper at Summit with the name or title *"Summit Record,"* or any imitation thereof.

The complainant's bill also prays that he may be declared entitled to demand and receive from the postmistress at Summit (who is made a party defendant) mail matter addressed to the *"Summit Record,"* and that Smythe may be restrained from

demanding or receiving the same. This part of the remedy requires to be administered with care and caution. Remittances of cash to Mr. Smythe for past work, and letters referring to such work, may come through the mails, and will undoubtedly belong to Smythe. At the same time, if he obeys the injunction and complainant continues the publication of the paper, all communications touching new matter will belong to him. I think that the complainant is entitled to this part of the remedy also, but it must be administered through an officer of the court. A receiver for this purpose, residing at Summit, will be appointed to receive, open and examine mail matter addressed to the "*Summit Record*," and to deliver the same to the party who shall appear to be entitled to it upon the principle above stated.