## GOSSARD BREEDING ESTATES, Inc. v. TEXAS CO. et al.
### Civil Action No. 766.

District Court, D. Colorado.
Sept. 30, 1946.

Addison M. Gooding, of Steamboat Springs, Colo., and Walter W. Blood, of Denver, Colo., for plaintiff.

Brock, Akolt, Campbell & Myer, of Denver, Colo., Sidney E. Pleasant, of Craig, Colo., and Yates A. Land, of Tulsa, Okl., for defendants.

SYMES, District Judge.

This matter has been before the court on many occasions since the trial and verdict of the jury at Grand Junction. From time to time the court has filed memorandums on questions that have arisen subsequent to the verdict. At a hearing August 1, 1946, the court expressed the view that an injunction should be granted limiting the

amount of water diverted by the defendants to an amount sufficient for present limited operations only.

At the suggestion of the court counsel have submitted proposed findings of fact and conclusions of law. It is now time that the terms of the injunction should be definitely settled.

The court has reread the entire record and is impressed that the evidence of the plaintiff as to any actual damages suffered as the result of any interference by defendants with plaintiff's decreed water rights is not definite or satisfactory—as the jury seemed to feel also. To illustrate: Mr. Gossard, president of the plaintiff company, himself testified that he lived at Steamboat Springs, 70 miles away, and not on the ranch; simply drove by it three or four times a week; never actually irrigated it and kept no records.

Walker, a former hired farm hand, was employed on the ranch from 1931 to 1936. He stated that due to snow conditions there had been less water in the latter years. On cross-examination he testified he noticed the flow in Wilson Creek at various times of the year—the last time a few days before he testified at Grand Junction—and noticed no diminution at that time of the amounts, compared with former years, and the flow on that date appeared normal.

No one connected with the ranch testified they ever kept any books, accounts, or records of any kind showing the cost of production, income from the crops, etc.

Furthermore, no one took any actual measurements of the flow in Wilson Creek either before or after the alleged interference therewith by the defendants, and most, if not all, plaintiff's witnesses testified that the water supply depended to a very large extent on the amount of winter snowfall, and the spring runoff. Two other witnesses of the plaintiff, Merritt and Ernwein, as well as Mathews and Neish, and the defendants' witnesses called by the plaintiff for cross-examination, testified to the same effect, Merritt stating that the flow of the creek depended upon the snow and rain, and since 1932 that region had undergone a dry cycle.

Francis N. Bosco, one of plaintiff's experts, qualified as a petroleum engineer and geologist. Stated he never made any measurements of the stream flow in Wilson Creek, or in Wilson Creek Valley prior to the time the Collom Wells were drilled, and that he never stated whether or not the stream flow or the water level in Wilson Creek under the Mountain Meadows Ranch had been diminished, and that he drove along the creek in a car, stopping at points he considered needed critical study. That before expressing his opinion as an expert on the geological structure of Wilson Creek, he made no tests, but based his testimony on pure observation made on the ground on four different occasions, and made no measurements or tests as to the rate of flow of water through the Trout Creek sandstone.

The defendants' witness Mathews, called by plaintiff for cross-examination, said the water taken by defendants was used not only for actual drilling operations, but also to irrigate lawns, flowers, trees and other uses not strictly pertaining to well drilling.

Plaintiff's Ex. 6—a summary prepared by the defendants of the amount of water produced from the Collom Wells commencing with 1939, up to and including August, 1945—shows the amount of water taken therefrom by defendants for 1939 to be 17,439 barrels. That year water was pumped during July and August only. In 1940, 27,369 barrels of water were pumped May to August inclusive; 1941 from June through the balance of the year 70,951 barrels; 1942 water was pumped in each month of the year, and totaled 133,579 barrels. In 1943 water was pumped every month of the year, a total of 74,158 barrels; 1944 water was pumped each month of the year for a total of 243,430 barrels; 1945 the amount pumped from January, to and including August, was 345,177 barrels.

■ Turning to the law: Let us state a few well-known equitable maxims:

"Equity delights to do justice, and that not by halves." 30 C.J.S., Equity, § 104.

Equity aims to have all interested parties in court and to render a complete decree adjusting all rights, and protecting the

parties against future litigation. That when equity once acquires jurisdiction it will retain it for all purposes, legal or equitable, so as to afford complete relief and doing entire justice. 30 C.J.S., Equity, § 67.

In Joyce on Injunctions, Vol. 1, p. 40, § 20, the author states an application for an injunction should be denied, unless it clearly appears the injunction will do the defendant no serious harm, and its refusal will subject the plaintiff to peculiar hardship. That an injunction will not be granted when the injury complained of is slight, compared to the inconvenience to the defendant and the public that would result from granting the injunction. And where an injunction may seriously affect the interests of the defendants, and would be of no advantage to the plaintiffs, the court in the exercise of the judicial discretion— which it is bound to exercise—may properly refuse to grant the injunction. See also Rice & Adams Corp. v. Lathrop, 278 U.S. 509, at page 514, 49 S.Ct. 220, 73 L.Ed. 480, holding an injunction is not a matter of strict right, but addressed to the sound discretion of the court, and the court should exercise its discretion principally based on a balancing of the relative conveniences and inconveniences which might result. And at page 515 of 278 U.S., at page 222 of 49 S.Ct., 73 L.Ed. 480:

"* * * 'a court of equity ought to do justice completely and not by halves,' and to this end, having properly acquired jurisdiction of the cause for any purpose, it will ordinarily retain jurisdiction for all purposes, including the determination of legal rights that otherwise would fall within the exclusive authority of a court of law."

And, generally, an injunction will never be granted when it will be productive of hardship, oppression or injustice, or public or private mischief. Joyce on Injunctions (supra), pp. 41, 42, § 20. And p. 26, § 12 states where there is jurisdiction to grant an injunction, damages may be given instead. Page 22, § 10. Equity aims at complete and final relief in a single action in respect to all matters between the same parties growing out of the same general transaction. Citing Lamming v. Galusha, 135 N.Y. 239, 31 N.E. 1024, holding that plaintiff may unite in a single action all his claims, legal and equitable, arising out of the same general cause. See also Federal Rules of Civil Procedure, rules 8 (e) (2) and 18 (b), 28 U.S.C.A. following section 723c.

43 C.J.S., Injunctions, § 30, states the court will take into consideration the relative inconvenience or injury which the parties will sustain by the granting or refusal of an injunction. To the same effect see Barker v. Mintz, 73 Colo. 262, at page 266, 215 P. 534. And 43 C.J.S., Injunctions, § 14. Injunctive relief is not a matter of right, but its grant or refusal usually rests in the sound discretion of the court. And § 64 of the same volume. Where a mandatory injunction is asked, the right must depend on consideration of the equities between the parties. "In determining whether an injunction shall issue in case of a continuing trespass the courts ordinarily will not apply the rule of comparative injury; but, as is shown infra § 67, circumstances may be such that the application of this principle is proper."

And, § 67: "Where, however, it appears that no irreparable injury would be sustained and that legal remedies would suffice, the court may refuse an injunction." And, page 532: An injunction should not be granted where the person injured will obtain but small benefit, and the injunction will operate oppressively and to the great annoyance and injury of the other party.

A similar situation to that presented here is found in Colorado Power Co. v. Pacific Gas & Electric Co., 218 Cal. 559, 24 P.2d 495. This is the final opinion on rehearing of the same case previously reported in 19 P.2d 498.

The plaintiff, a corporation, owned certain land riparian to the Mokelumne River, ten miles downstream from Electra. Incidental to its ownership it owned full riparian rights, subject only to certain rights of defendant, and its lands admitted the economical construction and operation of a low head hydro-electric power project and it for sometime had been planning to construct such a plant on its lands, using the unregulated flow of the stream as motive power.

The defendant corporation is the owner of a hydro-electric power plant located on the Mokelumne River at Electra, ten miles up stream from plaintiff's land, and for many years had, by means of reservoirs, ditches and canals, impounded a portion of the flow of the river for power and other public purposes. For sometime prior to the commencement of the action defendant had been in the process of constructing dams and reservoirs on these upper riparian lands for the purpose of impounding, storing and regulating all of the usual periodic and natural flow of the north fork of the stream and some of its tributaries for power purposes, and by means thereof to regulate artificially the flow of the stream in the manner as set forth in its amended answer. That is, by filling its reservoirs at periods of high flow, and releasing the same during the dry season, and maintaining, as far as possible, a regulated flow throughout the year.

The trial court found as a fact that the proposed storage would produce artificial changes in the flow of the river where it flowed over the plaintiff's lands. The trial court also found that such storage, and the defendant's proposed regulation of the natural flow of the river by means of the storage and discharge of stored water from the reservoirs, would constitute a violation and invasion of the plaintiff's riparian rights as the owner of said riparian lands, and if continued would irreparably impair such riparian rights, and thereby damage the plaintiff, and ought to be enjoined, unless the defendant should pay to the plaintiff just compensation for the damage to be caused by the defendant's violation and invasion of the plaintiff's said riparian rights. The court further found, and held, that the plaintiff was entitled to recover damages accordingly, and proceeded to fix the amount of the just compensation.

Furthermore, the court ordered that the defendant as part compensation release and return to the channel a minimum amount of water, which together with the damages allowed, would equal just compensation, and that the same was allowed to fairly compensate the plaintiff for the difference in the market value of its property. And, further:

"2. [syllabus] Lower riparian owner, whose riparian use is substantially disturbed by upper riparian owner's seasonal storage of water for power purposes, may have injunction or damages".

The appellate court rejected the contention of the defendant that the portion of the judgment commanding it to operate its reservoirs in a prescribed manner was erroneous. In other words, the court specifically found that the defendant should be permitted to store water upon its offer to release the water stored according to a certain plan, and the right of the plaintiff to compel the defendant to so release the water substantially was given to the plaintiff as part of the compensation for the damage to its riparian rights. The court then said, 24 P.2d at page 499:

"Moreover, it is a fundamental principal of equity that, if circumstances will permit, the equity court will strive to determine the entire controversy, and will award full and final relief so as to bring all possible litigation over the subject-matter within the compass of one judicial determination."

And that the plaintiff need not be remitted to a series of separate actions to protect the benefit which the defendant offered the plaintiff as a means of reducing the monetary compensation.

 In its memorandum of June 11, 1946 the plaintiff contends that defendants' taking of any water other than in excess of plaintiff's decreed priority would be the taking of plaintiff's property without just compensation. The Constitution of Colorado, § 5, Art. 16, declares that the water of every natural stream not heretofore appropriated is declared to be the property of the public, dedicated to the use of the people of the state, subject to appropriation as "hereinafter provided". And as construed in Wheeler v. Northern Colorado Irrigation Co., 10 Colo. 582, at page 587, 17 P. 487, 489, 3 Am.St.Rep. 603, by the Supreme Court:

"Our constitution dedicates all unappropriated water in the natural streams of the state 'to the use of the people,' *the ownership thereof being vested in 'the public.'* * * * while the paramount right to its

use, unless forfeited, continues in the appropriator".

Platte Water Co. v. Northern Colorado Irrigation Co., 12 Colo. 525, at page 531, 21 P. 711, 713, holds the only thing that can be acquired in respect to such waters is a right to the beneficial use thereof "by diversion through prior appropriation, rather than by grant." And that an appropriation to be valid must be manifested by certain acts showing an intent to take the water for beneficial use.

It would therefore seem that an appropriator or user of water for irrigation in Colorado, by complying with the law in respect to appropriation and beneficial use, etc., acquires a right to the use of the water, and not the title thereto.

The jury found the defendants have taken some water belonging to plaintiff under its decreed priority, but that the damages amounted to $1.00 only.

The court is of the opinion that there is no satisfactory evidence of the amount of water plaintiff is deprived of, or of any damage that the plaintiff has or will suffer in the future. It is therefore a case for the application of the comparative injury doctrine. Atchison v. Peterson, 87 U.S. 507, 20 Wall. 507, 22 L.Ed. 414, and Sussex Land & Live Stock Co. v. Midwest Refining Co., D.C., 276 F. 932, and cases cited in previous memorandums. That is, under all the circumstances an absolute injunction would injure the defendants more in their operations and thus seriously affect a business or industry of great benefit and value to that part of our state in particular, and the state and nation in general; while on the record as it now stands no lasting injury would be suffered by the plaintiff.

The court finds an injunction should be granted, limiting the amount of water taken from the so-called Collom Wells each year to 216,000 barrels—the equivalent of 36 acre feet—this being the amount found necessary to carry on the defendants' drilling operations. Further, that the defendants should be restrained from using any of the water so diverted from the Collom Wells for irrigating or maintaining lawns, etc., or for any purposes, etc., not strictly neces-

sary in or about the carrying on of drilling operations. Further, that none of the water shall in any manner, directly or indirectly, be used for drilling operations of greater extent than those carried on at the time this suit was begun, and that water for drilling new wells, or other uses, must be obtained from other sources.