## MOYLE et al. v. SALT LAKE CITY.

No. 6328. Decided January 6, 1947. (176 P. 2d 882.)

202

See 30 C. J. S., Eminent Domain, sec. 339; 18 Am. Jur., 890. Effect of abandonment of eminent domain proceedings, note, 121 A. L. R. 88. See, also, 18 Am. Jur. 1015.

*E. R. Christensen, Gerald Irvine* and *Alonzo P. Kesler,* all of Salt Lake City, for appellant.

*Thomas D. Lewis, David T. Lewis, Oscar W. Moyle, Jr.* and *Daniel T. Moyle,* all of Salt Lake City, for respondents.

LARSON, Chief Justice.

This case came to the writer on reassignment.

Plaintiffs recovered a judgment against defendant for the use of water owned by plaintiffs, but taken and withheld from them by defendant. From this judgment defendant appeals, assigning 25 asserted errors as grounds for reversal. The assignments however present only two questions for consideration of this court.

1. Does plaintiffs' complaint state a cause of action?

2. If plaintiffs are entitled to recover what is the proper measure of damage?

A proper consideration of these questions impels an understanding of the background out of which this suit arose. Many years before this action was commenced, plaintiffs became the owners of certain water rights in Big Cottonwood Creek which along with water rights of other parties were diverted from the natural channel through the Big Cottonwood Tanner Ditch. In all there were 1795 units or shares. In due course, the Big Cottonwood Tanner Ditch Company, a water corporation, (hereafter called the corporation) was organized among such water users and most of the water transferred to such corporation. Some of the users did not so transfer all their rights. Plaintiffs transferred 23 shares taking stock in the corporation therefor, and retained and refused to transfer to the corporation $22\frac{3}{4}$ shares or units of their water right. The water right thus retained had been, and continued to be, diverted through the Tanner Ditch.

In 1920, defendant (hereinafter called the City) entered into an exchange agreement with the corporation whereby the City obtained the right to divert from Cottonwood

Creek into its watermains all of said waters to which the corporation was entitled, except 2.591 second feet during the six summer months of the year, and 1.436 second feet during the winter months, which water the city was to deliver to the stockholders of the company through suitable watermains to be installed by the City. The city also undertook to provide the company with irrigation water by delivering into the Big Cottonwood Tanner Ditch, near its point of diversion from Cottonwood Creek, certain specified quantities of non-potable water from Utah Lake, brought to the point of delivery by means of canals and pumps. Since Moyle and others had in the Big Cottonwood Tanner Ditch, potable waters from Big Cottonwood Creek which were not involved in the exchange agreement, friction developed, among other things, over the pollution of this water by the admixture of the Utah Lake water. As a result thereof, on June 28, 1926, the City commenced in the District Court of Salt Lake County a proceeding against the Moyles to condemn said water rights of the Moyles in the Big Cottonwood Tanner Ditch, and take such water for the benefit of the city and its inhabitants, and in lieu thereof to furnish Moyles with other waters suitable for irrigation, and on July 23, 1926, obtained from the court an order authorizing it to take immediate possession of such waters.

To this complaint, Moyles filed a demurrer and a motion to strike, and no further proceedings in court were had in said cause until October 1937, when Moyles called up for disposition the demurrer and motion. The demurrer was sustained by the court, the City refused to amend and on January 7, 1938, caused the case to be dismissed, without notice to Moyles. In April 1939, Moyles presented to the City a claim for $4,150 for the use and possession of such waters from the date of the aforesaid order of possession to the date of claim. When the City refused payment, this action was commenced. Moyles recovered judgment for the amount and the City appeals, presenting the questions posed at the beginning of this opinion.

1. The question as to whether the complaint states a cause of action revolves upon a number of factors which we note in order. (a) Where a condemnor by court order obtains possession of the property sought to be condemned, and then surrenders the property and dismisses the action before the assessment of damages, may the condemnee maintain a suit for value of the use and possession during the occupancy? We are not concerned at this time with questions.as to the right of the property owner to recover expenses incurred in protecting his property rights, and in defending against condemnation proceedings which have subsequently been abandoned. Nor do we have involved here questions of losses due to depreciation in market value during pendency of the proceedings, nor profits in sales lost because of the proceedings to condemn, nor of damages actually done to the freehold. We are here confined to the narrow question of.right to recover for the loss of the use and occupation because of the condemnor having possession of the property while the suit was pending. The City argues extensively, and cites authorities that a municipality is not liable for damages upon abandonment of condemnation proceedings. That is all beside the point. The authorities relied upon do not involve cases where the City took actual possession of the property pendente lite.

The right of eminent domain is an arbitrary power, and so the constitution has limited, confined and guarded the exercise of the right. It provides that private property shall not be taken or damaged except for purposes of public utility and for adequate compensation. This prerogative is only allowed where the letter of the law, permits it and then only under careful observance of the rules prescribed for the protection of the owner. *Owen v. City of Springfield*, 83 Mo. App. 557; Cooley Const. Lim. 651. The majority of the decisions hold that a rule that a municipality is not liable for damages sustained by the property owner resulting from the institutions of the condemnation proceeding which are subsequently abandoned does not apply in instances of actual damage to the freehold,

or where the condemnor takes possession of the property. See Ann. 31 A. L. R. 364, 18 Am. Jur. p. 1041. And many of the cases hold the City liable for all damages resulting to the property owner from the institution of the suit. Such cases are unimportant here since this action rests upon the theory that possession was taken and no damages are claimed except for the use and possession of the property. Such an action will lie. *Salt Lake Investment Co.* v. *Oregon Short Line R. Co.*, 46 Utah 203, 148 P. 439, affirmed 246 U. S. 446, 38 S. Ct. 348, 62 L. Ed. 823. See Anno. 121 A. L. R. 88. See also *Hullin* v. *Second Municipality of New Orleans*, 11 Rob. La., 97, 43 Am. Dec. 202; *Feiten* v. *City of Milwaukee*, 47 Wis. 494, 2 N. W. 1148; *Graff* v. *Mayor, etc., of Baltimore*, 10 Md. 544; *United States* v. *Great Falls Mfg. Co.*, 112 U. S. 645, 5 S. Ct. 306, 28 L. Ed. 864; *United States* v. *Lynah*, 188 U. S. 445, 23 S. Ct. 349, 47 L. Ed. 539; *Jacobs* v. *City of Seattle*, 100 Wash. 524, 171 P. 662, L. R. A. 1918E, 131; *Kincaid* v. *City of Seattle*, 74 Wash. 617, 134 P. 506, 135 P. 820. Such damages need not be recovered in the condemnation proceeding, but may be sought by an independent action or proceeding. This is on the ground that any damages on account of such proceedings is not a damage to the property itself, but is of a personal character. *Utah Copper* v. *Montana-Bingham Con. Min. Co.*, 69 Utah 423, 255 P. 672. *State ex rel. City of St. Louis* v. *Beck*, 333 Mo. 1118, 63 S. W. 2d 814, 92 A. L. R. 373, followed by annotation, 18 Am. Jur. 1016.

(b) Have Moyles pleaded facts to bring them within the rule? In the complaint, it is alleged that Moyles were the owners of certain water rights, that the City commenced an action in the district court against Moyles, and in such action procured an order from the court granting the City immediate possession of Moyles' water; and that the City took such possession, and continuously maintained possession thereof until the commencement of this action; that the City dismissed the action against Moyles wherein it had secured the order for and possession of the water, but continued to keep possession

of, and to use the water; that the reasonable value of the use and possession of the water during the period it was so held by the city was $4,150 to plaintiffs' damage in that sum; that the claims had been presented to the City, but was rejected and payment refused. These facts are sufficient to bring the case within the rule announced in section (a), supra.

(c) The City contends that the complaint is deficient because it does not allege that Moyles would have put the water to a beneficial use had the City not taken it. No such allegation is necessary to state a cause of action. The demurrer admits that Moyles owned the water right ▪ and were deprived of the use thereof by the action of the City. If Moyles could not have put the water to a beneficial use, that may be a defense, or a mitigation of damage, but it is not a matter that must be specifically pleaded to state a cause of action. This is not an action to try title to a water right, which right is admitted by the demurrer, but to recover damage for being deprived of the use thereof.

(d) The City contends that the complaint should and does not allege that the waters were taken into possession of the City, and also that there is no allegation of damage. There is no merit in either contention. The complaint alleges that Moyles were the owners and en- ▪▪ titled to the use and possession of the water, and were deprived thereof by the City. The demurrer admits these facts. The complaint sets forth that Moyles were damaged in the sum of $4,150, the reasonable value of the use of the water for the many years involved in the action. That is sufficient against the demurrer filed. The complaint stated a cause of action.

2. This brings us to the question of damage.

The City maintains there is no evidence that it ever took possession of the water under the court order or otherwise; that the evidence shows that during the larger portion of each year the waters involved in this action were not diverted from the Big Cottonwood Tanner Ditch; that there

is no evidence that Moyles suffered any damage to their crops by being deprived of the water; that if plaintiffs were entitled to a reasonable rental value of the water, it should only be the rental value for the use to which the water had been put in the past; and that against the rental value, the City was entitled to credit for the value of the culinary water it furnished Moyles through the culinary pipes. We examine the record in the light of these contentions.

The City commenced an action to condemn Moyles' water rights. In that action they obtained from a competent court having jurisdiction of the parties and the subject matter, an order granting them immediate possession of the property sought to be condemned. Until such order was vacated and set aside it became the duty of Moyles to respect the same, and to exercise no control over the property, to not hold possession thereof and to not use the water. It certainly does not lay in the mouth of the City, after obtaining such order to say that Moyles should have violated it. The City argues the matter as though the action was one for damages to crops for loss of irrigation water. Such is not the case. The water the City sought to condemn as shown by its complaint was potable water, suitable for culinary uses; the water it offered in return was lake water suitable only for irrigation, and when the lake juice was commingled with the creek water, all was unfit for culinary purposes. To thus render the water unfit for the purposes for which it had been suitable is pro tanto, dispossessing the owner of the use and benefit thereof. The point is urged that after the order granting the City possession, Moyle was still issued tickets by the watermaster for his irrigation turns the same as before the order, and therefore he was deprived of no water. This is specious argument. He does not sue for crop damage for lack of irrigation water. He had other irrigation water rights in the Big Cottonwood Tanner Ditch which he used for irrigating his crops, and which was sufficient for that purpose. The water right herein involved was a right in excess of what he required for irrigation during those years, and which he could have

sold or rented had the City not taken the water. Likewise, fallacious is the argument that because this water was not turned into the City conduit it cannot be said that the City had possession thereof. Under its exchange agreement with the Big Cottonwood Tanner Ditch, the City was obligated to furnish the corporation with water in lieu of the water taken by it in the exchange. If the City used this Moyle water as part of the water it delivered to the corporation under the exchange agreement, it had possession of, and used the water just as definitely and absolutely as if it had put it in the watermains. The record shows conclusively that all creek water not diverted into the City mains under the exchange agreement was used by the City in supplying to the corporation the volume of water it was obligated to supply the corporation. And again, the City admits that during part of almost every year involved, the City commingled unpotable lake water with Moyles' canyon water; and for three years, to wit: 1936-1937-1938, the corporation as distributor of the waters of Big Cottonwood Tanner Ditch, which were the waters the city delivered to the corporation under the exchange agreement, did not even issue to Moyles a time or turn ticket for the 22¾ shares of water here involved, but distributed that time and water to other stockholders in the corporation. Furthermore the evidence is conclusive that after the City obtained the order for possession, Moyles did not draw or use any waters represented by the water rights involved in this action. The evidence justifies the finding and conclusion of the triers of the facts that the City had possession and use of the water rights here involved during the period of time involved in this action.

What then is the measure of damage for such use and possession? Certainly, since the City dismissed its action before adjudication of the value of the property, and surrendered possession of the property they had taken under the order, the measure of damages for the temporary dispossession would not be the value of the property had they completed the suit and made their posses-

sion permanent. This is evident from the provisions of Sec. 104-61-10, U. C. A. 1943, which provides plaintiff must

"Pay all damages arising from occupation before judgment in case the premises are not condemned." See *Utah Copper* v. *Montana-Bingham Consol. Mining Co.,* 69 Utah 423, 255 P. 672, 677.

Under general principles, as well as under our statute, the condemnor cannot deprive the owner of compensation by dismissal after possession has been taken. See 30 C. J. S., Eminent Domain, § 335. The City should respond in damages under our statute for all damages caused by the taking and holding possession. *Centralia & C. R. Co.* v. *Henry,* 31 Ill. App. 456, 30 C. J. S. Eminent Domain, § 16, 20 C. J. 1087. Only the losses inflicted on the owner by the institution of the action and possession of the property are recoverable. *Pittsburgh's Petition,* 243 Pa. 392, 90 A. 329, 52 L. R. A., N. S. 262; 30 C. J. S., Eminent Domain, § 339. Among such items is loss of rents. *Simpson* v. *Kansas City,* 111 Mo. 237, 20 S. W. 38; and deprivation of the use of the property. *Winkelman* v. *Chicago,* 213 Ill. 360, 72 N. E. 1066; *Pittsburgh's Petition,* supra; 30 C. J. S., Eminent Domain, § 339, p. 17, 20 C. J. p. 1088 and notes 10 and 12. That the reasonable rental value of property, the possession, use and control of which has been withheld from the owner or lawful possessor is a proper measure of damage for such withholding, in the absence of claims of special damage, is too elemental to require citation of authority.

But the City contends that Moyles should be limited to the reasonable rental value of the water for the use to which they had put the property before the City took possession. By that process of reasoning if any action commenced in 1932 (when prosperity was just around the corner) had involved condemnation of a lot and five room dwelling in Salt Lake City, and possession taken by the condemnor and held until 1946, the condemnee would for all the years be held to the $25 rents received in 1932, despite the fact that for half of the time he was kept out of possession the property would have rented for $100 to

$125 per month. A simple statement of the case is its own answer. It is elemental in eminent domain cases, that the owner is entitled to the value of the property for the highest and best use to which it could be put at the time of the taking, and is not limited to the use then actually made of it. In the case of *Shurtleff* v. *Salt Lake City,* 96 Utah 21, 82 P. 2d 561, we answered the argument adversely to the position of the City. That case also disposes of the next point urged by the City that Moyles were offered other water which was suitable for irrigation although not for other purposes.

We note one further point raised by the City. It contends that it furnished Moyles potable water through pipes for domestic and culinary purposes, and since lake water was available for irrigation they suffered no damage. The culinary water furnished Moyles through the pipes was water they were entitled to receive under the exchange agreement by virtue of the stock they held in the corporation and was not furnished them in connection with this suit or the water here involved. Some other points are raised by the City. We have examined them and find them without merit.

The judgment is affirmed. Costs to respondent.

McDONOUGH and WADE, JJ., concur.

WOLFE, Justice.

I dissent on the questions of damages and disposition of the case. On the other matters I concur. I think the judgment should be reserved and the case remanded for further proceedings in accordance with the principles hereinafter developed.

In approaching the problem of the measure of damages in a condemnation of water right as in all other condemnation cases regard must be had for the nature of the thing condemned. There are a number of decisions of this court represented by such cases as *Shurtleff* v. *Salt Lake City,* 1938, 96 Utah 21, 82 P. 2d 561, which indirectly assume that

the thing condemned is the water itself. Such is fundament-ally wrong. The corpus of the water is not owned by the appropriator until he reduces it to possession. *Adams* v. *Portage Irrigation, Reservoir & Power Co.*, 95 Utah 1, 72 P. 2d 648.

In the ordinary water right condemnation suit that which the condemnor seeks to condemn is the right to use the water from the main source in the future. The water which will subsequently be taken by said condemnor has not even fallen in the form of rain and snow on to the drainage area of the main source. The water itself is probably still in one of the oceans and in future years storms will deposit the same in the upper reaches of the drainage area and the condemnor will obtain the right to capture that water when it flows down its natural channel and to divert it for beneficial use.

No appropriator obtains title by his appropriation to any specific water. What he does acquire is a right to use. See *Clearly* v. *Daniels,* 50 Utah 494, 167 P. 820; *Hammond* v. *Johnson,* 94 Utah 20, 66 P. 2d 894. It is therefore, clear that the thing which is condemned is the usufructuary right.

The problem of determining the measure of damages in such a condemnation proceeding is on the way to solution when the nature and extent of that right is continually and firmly kept before us. An historical analysis of the law applicable to water rights in this state demonstrates that the usufructuary right is and always has been circumscribed and limited by the doctrine of beneficial use. The appropri-ator has never been entitled to a larger quantity of water under this usufructuary right than he could beneficially use. The proposition has been sustained by an unbroken line of decisions going back to territorial days.

This principle has been recognized in the statutory law Section 100-1-3, U. C. A., 1943, first pronounced by the Legislature of 1903, which states,

"Beneficial use shall be the basis, the measure and the limit of all rights to the use of water in this state."

The historical analysis likewise demonstrates that the doctrine of beneficial use should apply with all its rigor to the right to a particular *quality* of water. In this regard the decisions of this court and of the territorial court are not in harmony. I seek by this opinion to analyze the basis upon which the doctrine of appropriation is applied in the State of Utah. I shall then analyze the various cases which have dealt with the application of the doctrine of beneficial use as a limitation on the *quality* of water to which an appropriator is entitled by reason of the usufructuary right which he initiated. The cases cannot be harmonized but in my opinion the doctrine of beneficial use must, if we follow the principles upon which our water law is built, be applied to the quality of water as well as to the quantity.

The law of appropriation of water in the west arose first in connection with mining operations in the State of California. The genesis and history of the principles of appropriation are so wrapped up with the economic development of the old west and so much a part of its lore that, even at the cost of lengthening this opinion, I quote somewhat at length from Mr. Hutchins' excellent little book "Selected Problems in the Law of Water Rights in the West,"

"* * * the appropriative principle in the form in which it is now recognized throughout the West—embodying the essential element of priority—is not traceable to Mexican laws and customs, but sprang from the requirements of a mining region for protection in the use of water supplies needed to work the mining claims. The basis of the present doctrine of 'prior' appropriation is the maxim 'First in time, first in right'—the recognition and protection of a right acquired by an individual to an exclusive use of water, based strictly upon priority of appropriation and application of the water to beneficial use, and without limitation of the place of use to riparian land. This principle was developed from customs originating with the gold miners of California, who in formulating a workable set of rules could have been no more influenced by Spanish-Mexican law than they were by the common law of England. A rule was adopted as to the possessory right to mining claims, giving the first locator of a claim the superior right to the same as against all later comers, and the same rule was applied to appropriations of water for the purpose of working mining claims,

this element of superior right to the one who was prior in time having been theretofore unknown in the civil or common law governing waters or in the civil law as modified by Spanish-Mexican law. * * * The miners' customs became law, adaptable to diversions of water for irrigation as well as for mining purposes; and it is the specific principles there developed under the exigencies of that environment, rather than the less widely known principles of Mexican appropriation law and custom, that have been adopted by legislation and court decisions and are now a part of the water codes throughout the West." pp. 67-68.

The doctrine of prior appropriation was extended to other than mining uses at an early date. *Ibid.* pp. 69-70.

Congress by a law enacted July 26, 1866, 14 Stat. 253, Sec. 9, as amended July 9, 1870, 16 Stat. 217, and by the Desert Land Act of March 3, 1877 recognized and confirmed the rights of appropriators for irrigation, mining and manufacturing purposes. Desert Land Act, 19 Stat. 377.

The territory of Utah early gave expression to these same rights by Section 424, Compiled Laws of Utah 1888.

Our present statute Section 100-1-1, U. C. A. 1943, reads:

"All waters in this state, whether above or under the ground are hereby declared to be the property of the public, subject to all existing rights to the use thereof."

That statute with slight modifications has been in our statute books since 1903. Section 47, Chap. 100, Laws of Utah 1903.

As said by Mr. Hutchins, supra, page 104:

"Riparian rights have never been recognized in Utah. In the first case in which the Territorial Supreme Court had occasion to pass upon this matter, in 1891, it was stated:

" 'Riparian rights have never been recognized in this Territory, or in any State or Territory where irrigation is necessary; for the appropriation of water for the purpose of irrigation is entirely and unavoidably in conflict with the common law doctrine of riparian proprietorship. If that had been recognized and applied in this Territory, it would still be a desert; * * * The legislature of this Territory has always ignored this claim of riparian proprietors, and the practice and usages of the inhabitants have never considered it applicable, and have never regarded it' " [*Stowell* v. *Johnson,* 7 Utah 215, 26 P. 290].

By an unbroken line of cases this court has maintained the law of appropriation. *Whitmore* v. *Salt Lake City,* 89 Utah 387, 57 P. 2d 726; *Spanish Fork West Field Irr. Co.* v. *District Court,* 99 Utah 527, 104 P. 2d 353.

There is no question that as to the *quantity* of water in a water right the beneficial use is "the basis, the measure and the limit" of that right. The case at bar deals with the *quality* of the water the water right calls for. Is the quality of the water called for by a water right also based on, limited and measured by the beneficial use made of water by the appropriator?

The main opinion citing the case of *Shurtleff* v. *Salt Lake City,* supra, holds that Moyle is entitled to the value of the property taken for the highest and best use to which it could be put at the time of the taking and not to the use then actually made of it.

With the general proposition I find no fault when applied to property owned in a proprietary capacity. However, the main opinion, the court in the Shurtleff case and dicta and holdings in other cases which will be specifically discussed hereafter apply the rule without first deciding exactly what type of property is being taken by the proceedings or, in damage suits, exactly what type of property was damaged or destroyed.

The writer of the main opinion makes the same mistake as the court made in the Shurtleff case—he assumes that the water right involved included the right to have water continue to be available for use of the same *quality* as when appropriated regardless of the use made of it. On that assumption he applied the well established eminent domain rule mentioned above and allows the owner of the water right the value of the water right for the highest use to which water of the quality originally used can be put, in this case, for domestic purposes.

The assumption that the Moyle water right interfered with by the city in this case was the right to potable water even though it had been used by him and his predecessors

in interest merely for irrigation purposes is contrary to the spirit and letter of the water law of this state. Like assumptions have been made in other cases.

The facts in the case of *Shurtleff* v. *Salt Lake City,* supra, were almost identical with those in the case at bar on the question here discussed. The same mountain stream was involved, the same exchange agreement for Utah Lake water was involved. Shurtleff was supplied through pipes of the city all the potable water (20,000 gallons per day) he had acquired by beneficial use as determined by a prior court decree. In determining the question of damages which Shurtleff suffered by the city taking the amount of potable mountain water which he had used for irrigation and substituting Utah Lake water which was fit for irrigation but was not fit for domestic purposes the court said [96 Utah 21, 82 P. 2d 564]:

"Let us assume that plaintiffs' land and water rights were located in a small farming community wherein there was a surplusage of water for culinary purposes. Suppose in that locality their water rights were destroyed in the construction of a public power dam. It would be reasonable to believe that under such assumed circumstances there would be no demand upon the market for plaintiffs' water rights for culinary purposes; and experts called upon that question would probably so testify. In the present case, however, their property is located near a large city. The city has taken the water for culinary purposes. Is it not reasonable to believe that experts called upon the question here would testify that there is a demand for those water rights for culinary purposes? Would not a prospective purchaser of plaintiffs' property be influenced by the fact that such a demand by the city may arise as has arisen in this case? In other words, if there is a demand on the market for those water rights, because those who make the demand think the rights can be put to more valuable use and are therefore willing to pay more for them, the owner is entitled to the benefit of that demand even though his own use of the rights may be limited."

The court in that case apparently assumed that because clear, pure, potable water had been used by Shurtleff for irrigation he acquired the right to use potable water. As stated early in this dissent I think that assumption was erroneous. Shurtleff received through the pipes of Salt Lake City all the potable water to which his beneficial use

entitled him. The right to the other water was to water suitable for irrigation. If Salt Lake City supplied water suitable for irrigation and took the potable water for beneficial use as potable water Shurtleff received all he was entitled to and the city *by its beneficial use* of the potable water thereby carved from the public waters a use right for a purpose higher than irrigation, assuming the city also followed the appropriation procedure set out by the statute.

In *Little Cottonwood Water Co.* v. *Kimball,* 1930, 76 Utah 243, 289 P. 116, 120, an application to exchange water was denied because the water proposed to be turned into Little Cottonwood Creek by the applicant in exchange for the potable water of the creek was inferior in quality to the water in the creek and the commingling of the inferior water would render unfit for domestic and culinary uses the entire stream below the point of commingling. It was found in that case that the commingled water was as good for irrigation purposes as the original stream and the applicant proposed to supply potable water by pipe to all persons entitled thereto below the point of commingling. The court denied the application to exchange because the statute authorizing exchanges, Laws of Utah 1919, c. 67, par. 9 as amended by Laws of Utah 1921, c. 72 provided:

"Upon application in writing and approval of the state engineer, any appropriated water may be turned into the channel of any natural stream * * * and commingled with its waters, and then be taken out, either above or below the point where emptied into the stream, * * * but, in so doing, the original water in such stream, * * * *must not be deteriorated in quality* or diminished in quantity." Italics added.)

The decision of the court rested on the language of the statute. Nothing was said about the rights of lower users and whether independent of the statute they would be intitled to potable water for their irrigation purposes.

Mr. Justice Elias Hansen dissented on the above holding in the *Little Cottonwood* case. I quote at length from his dissent because I think it so well and accurately states the law and the wasteful economic consequences of holding that

an appropriator is entitled to resist substitution of equally suitable water for the irrigator's use in place of clear mountain water that I shall not trust only to a reference to bring it to the attention of the reader.

"My associates are of opinion that, as the water of Utah Lake is inferior in quality to the water of Little Cottonwood creek for domestic and culinary uses, the state engineer was not authorized to approve the so-called 'exchange application.' If the stockholders of the respondent company were, under the proposed plan of exchange, to be compelled to use Utah Lake water for domestic or culinary purposes, then the conclusions reached in the prevailing opinion would be clear. The stockholders of the respondent company, however, under Kimball's exchange application, will have no occasion to use Utah Lake water for any other purpose than that of irrigation. The water of Utah Lake is equal in quality to the water of Little Cottonwood creek for irrigation purposes. The district court so found, and such finding is not here questioned by anyone to this proceeding.

"It is a cardinal principle of law that, in construing a statute, the primary and sole object of the courts is to give effect to the real purpose and intent of the Legislature. Courts frequently are required to either restrict or enlarge the ordinary meaning of words in order that the plain legislative purpose may be accomplished. It has ever been the law of this state that the title to water appropriated from a natural source has been in the public. The appropriator can acquire only the right to the use of the water. The rights of the appropriator are measured and limited by the beneficial use to which the water is put. *If an appropriator uses water solely for irrigation purposes, his right should be measured and limited by the use for such purpose. I can perceive of no good reason why the provisions of the law which makes beneficial use the basis, the measure and the limit of all rights to the use of water in this state should not and does not apply to the quality of water as well as to the quantity of water which is put to a beneficial use.* There can be no doubt but that the purpose sought to be accomplished by limiting the right of private ownership to water arising from natural sources was to make it impossible for an individual to prevent the further use and consequent development of our natural resources. The adoption of a rule of law that an appropriator of water suitable for culinary uses has a vested right to use such water for irrigation purposes when other water equally suitable for irrigation is made available to such appropriator without any additional cost to him might well tend to retard the development of this state as much as would the adoption of a rule of law recognizing that an appropriator of water has a vested right to use more water than is reasonably necessary  *  *  *.

"If the result reached in the prevailing opinion is to become the established law in this jurisdiction, it means this: Even though our mountain streams may be used to render productive our otherwise barren higher lands, and even though the lower lands can be supplied with water equally suitable for irrigation and without cost to the lower lands, none the less the higher lands must forever remain barren and unproductive merely because the lower lands were the first to be irrigated with the water from our mountain streams. Such a policy on the one hand permits the perpetual waste of water available for the irrigation of our lower lands and on the other hand perpetually withholds from productivity vast areas of our state. It was for the very purpose of avoiding the evils that would necessarily flow from such a rule that the lawmaking power provided that 'the waters of all streams and other sources in this state, whether flowing above or under the ground, in known or defined channels, is hereby declared to be in the public subject to all existing rights to the use thereof,' and that 'beneficial use shall be the basis, the measure and limit of all rights to the use of water in this state.'

"With the constant increase of our urban populations, there is an ever increased demand for more water suitable for culinary uses. The supply of water suitable for culinary uses is limited, and doubtless, in many instances, must be secured from water which has heretofore been used for irrigation purposes. Where there is a demand that water heretofore used for irrigation be applied to culinary and domestic purposes, I can see no good reason why such demand should not be satisfied so long as those who have appropriated the water taken to satisfy such demand are supplied with an equal quantity of water equally suitable for the irrigation of their lands and without any cost to them. If water has been appropriated for the sole purpose of generating electric power, the appropriator should not be heard to complain merely because water has been turned into his source of supply which renders it unfit for irrigation and domestic purposes. So, likewise, an appropriator of water for extracting precious metals from ores should not be heard to complain merely because his source of supply has been rendered unfit for irrigation and domestic purposes. *I believe the correct rule to be that, so long as the quality of water supplied meets the requirements of the uses to which it is put, no vested right is infringed, and the appropriator may not be heard to complain.*

\*     \*     \*     \*     \*

"\*     \*     \* Water appropriators should not be permitted to play the part of the proverbial dog in the manger." [76 Utah 243, 289 P. 120.]   (Italics added.)

In 1937 the legislature amended Section 100-3-20, R. S. U., 1933, which section in the 1933 Revision read as did the section at the time the Kimball case was decided. That amendment merely added the four italized words in the following excerpt from that section:

"* * * the original water * * * must not be deteriorated in quality or diminished in quantity *for the purpose used,* * * *."

It is obvious that the legislature added those four words either because it concluded that this court in the Kimball case misinterpreted its intent as expressed in the original statute and that it desired to make its intent more clear *or* the legislature was persuaded by the logic of Justice Elias Hansen's dissent in the Kimball case and comparable arguments to change its former intent. The third possibility is that the statute is unconstitutional. This would be the result if the *Shurtleff* and *Sigurd City (Sigurd City* v. *State,* 105 Utah 278, 142 P. 2d 154) cases which were decided after the 1937 amendment correctly state the law. If the statute permitting a change of use, Section 100-3-3, gives the appropriator a vested right such right cannot be taken away without just compensation. It would follow then that the amended statute which attempts to allow a person to commingle his water if the quality of the original water is not deteriorated "For the purpose used" would be unconstitutional as it would authorize a taking or destruction of that right to change the use without compensation. We will not assume that the legislature intended to act unconstitutionally. Therefore, in determining the legislative purpose for the 1937 amendment we have a choice between finding its purpose to be to definitely announce that its policy had always been one of permitting substitution or commingling of waters as long as such acts did not diminish the quantity or deteriorate the quality *for the purpose used* or that it recognized a right of appropriators to prevent any one from deteriorating the quality of the water appropriated regardless of the use to which it was put and that it desired prospectively to withdraw such right. I think the former was

clearly the purpose. Section 100-3-20 as amended would have accomplished little indeed if it applied only to waters appropriated after 1937 because most of the waters of this state had been appropriated or developed many years before that date. Viewed in the light of the reasoning of this opinion it seems clear that the Legislature made the 1937 amendment in order to express what it conceived to have been the policy in this state down through the years.

The case of *Sigurd City* v. *State,* 1943, supra [105 Utah 278, 142 P. 2d 159], was a proceeding to condemn water rights for the use of the city for domestic purposes. The condemnee had used the water for irrigation purposes. On the question of just compensation for the water right taken we held, citing *Shurtleff* v. *Salt Lake City,* supra, that the condemnee was entitled to the benefit of any demand on the market for the right to use the water even though his use thereof was limited. We further said:

"The fact that defendants had used the water for irrigation purposes does not limit the value of the water to them since 100-3-3, U. C. A., 1943, provides that upon application to the State Engineer an appropriator may change the use of his water."

On this proposition I think we were in error in the *Sigurd City* case. I have already expressed my view on the *Shurtleff* case. Does Section 100-3-3, U. C. A. 1943 support the proposition? The pertinent parts of that section read as follows:

"Any person entitled to the use of water may change the place of diversion or use and *may use the water for other purposes than those for which it was originally appropriated,* but no such change shall be made if it impairs any vested right without just compensation. * * *.

"No permanent change shall be made except on the approval of an application therefor by the state engineer * * *. The procedure in the state engineer's office and the rights and duties of the applicant with respect to applications for permanent changes of point of diversion, place or purpose of use shall be the same as provided in this title for applications to appropriate water.

"No temporary change shall be made, except upon an application filed * * * with the state engineer * * *. The state engineer

shall make an investigation and if such temporary change does not impair any vested rights of others he shall make an order authorizing the change  *  *  *.

"Applications for either permanent or temporary changes shall not be rejected for the sole reason that such change would impair vested rights of others, but if otherwise proper, they may be approved as to part of the water involved or upon condition that such conflicting rights be acquired." (Italics added.)

Comparable sections have been in our laws for many years. Section 1263, Revised Statutes of Utah 1898, reads as follows:

"Changing use or place of diversion. The person entitled to the use of water may change the place of diversion, and may extend the ditch, flume, pipe, or aqueduct, by which the diversion is made, to any place other than where the first use was made, and may use the water for other purposes than that for which it was originally appropriated, but no person shall change the place of use of water to the damage of his co-owners in such right without just compensation."

The present Statute, 100-3-3, allows a change of use upon application to and approval by the State Engineer. Does that mean that an appropriator has a vested right to change the use regardless of water rights others may have acquired subsequent to his appropriation? Or does it mean that after an appropriation has been made in a stream that no right may be acquired by other persons if those prospective rights would interfere with the prior appropriator's use of the water *or any other use to which he may some day desire to change his present use?* To illustrate: in 1910 A appropriates all of the water at point X in a mountain stream containing potable water. He uses the water exclusively for irrigation. In 1930 B constructs a manufacturing plant a mile upstream from Point X. B uses nonconsumptive water from the stream in his manufacturing plant. Certain material which renders the water unfit for domestic consumption and culinary purposes but which does not affect its fitness for irrigation is discharged into the water by the plant.

If Section 100-3-3, U. C. A. 1943 (or comparable earlier sections) gives an appropriator a vested right to change

his use of the water at any time B would have to pay A for the deterioration in quality or he could not use the water from the stream. In other words, A, a lower user on the stream could prevent the use of the water above him though that use does not prevent him from using the water for the only use he has ever made of it, to wit: irrigation.

I do not think that the legislature by Section 100-3-3, U. C. A. 1943 or comparable earlier sections intended to change 100-1-3, U. C. A. 1943 and comparable earlier sections which made beneficial user the basis, the limit and measure of the right to use water in this state. Section 100-3-3, as interpreted in the *Sigurd City* case gives an appropriator not only the right to use the water in the way he used it when he appropriated it but also the right to use it in any possible way water of the quality the water was when first taken can be used. I now think that interpretation was incorrect. In the example put above, B should be given the right to the non-consumptive use proposed without paying for it. Under 100-3-3, A has the right to change his use, however, subject at all times to the right others have *at the time the change application* is made. If that is the meaning of 100-3-3, then all A acquired by his use of the water for irrigation was the right to use water *fit for irrigation*.

Much the same can be said of the right to change the point of diversion. That right given by 100-3-3 and earlier comparable sections is not a vested right an appropriator acquires at the time of appropriation and subject only to the *then* existing rights of others. It is a right which is subject to all the water rights which are existing *at the time the change in point of diversion is desired to be made and it does not prevent any rights from being acquired by others.* On this point we said in *United States* v. *Caldwell*, 64 Utah 490, 231 P. 434, 439:

"Nor is there any merit to the contention that, if the exchange in this case be permitted, the appellants will be deprived of their vested right to change their point of diversion if they so elect in the future. That question is considered in *Salt Lake City* v. *Utah & Salt Lake*

*Canal Co.,* [43 Utah 591, 137 P. 638] and decided against plaintiffs' contention that their right would thereby be invaded. A complete answer to the contention, however, is that *appellants' right to change the place of diversion is not an absolute or vested right, but is only a conditional or qualified one.* No such change can be made if thereby the public, or any other appropriator, prior or subsequent, is adversely affected. Nor can a prior appropriator prevent a subsequent appropriator from using any of the unappropriated waters of this state to the fullest extent possible merely because the prior appropriator in the future may desire to change his place of diversion * * *." (Italics added.)

Section 100-3-3 seems to me to be a recognition that an appropriator has the right to use water only for the limited purpose for which it was appropriated or for which he has changed the use in accordance with said section. And until he changes the use in accordance with Section 100-3-3 which contemplates an imminent *changed beneficial use* of the water his rights are limited to his previous use of that right.

The idea has been advanced that an appropriator has an "inchoate right" to exact a change of type or place of use. An inchoate right is an incipient right, a right not yet complete, one not yet matured. But I assume that those who advance this idea would of necessity be compelled to hold that such incipient or partial right, whatever its nature if it exists, had vested, in which case what was said above as to vested rights to exact a change would apply. But I shall go further and examine the validity of this concept of "inchoate right" and if one chooses to denominate a statutory provision which permits a change of type or place of use as an "inchoate right" whatever the nature of such right is, whether it is vested and the conditions under which it exists.

It should be noted that in case of an application for a *permanent* change as compared to a temporary change the procedure shall be the same as is provided for in applications to appropriate water. Section 100-3-8, U. C. A. 1943, declares when it shall be the duty of the State Engineer to approve an application. The right of the applicant is not absolute. The Engineer is required to determine certain

facts some of which involve the element of judgment. In the case of an application for a temporary change of use the Engineer

"*Shall* make an order authorizing the change" "If such temporary change does not impair any vested rights of others."

The *Shurtleff* case was evidently based largely on the conception of a vested right either complete or inchoate as appears from the quoted portion of that case set out above. But the word "shall" is used in Section 100-3-3 only in connection with an application for a temporary change of place of diversion or place or purpose of use.

But in treating this contention we will assume that when an appropriator for irrigation purposes desires permanently to change the nature of his use (let us assume for the purpose of supplying the waterworks of a town or city), he can compel the State Engineer to grant the change if it does not interfere with the vested rights of others or if such conflicting rights exist, they are acquired by the applicant for the change. But such so called "inchoate right" is in reality only a possibility that the appropriator for irrigation purposes may at some time desire to command the Engineer to grant it. In our assumed case of an appropriator for irrigation purposes, he cannot prevent others from polluting the water in pursuance of their application to appropriate water for a purpose which will have that result if the polluted waters are just as suitable for irrigation as the pure waters.

The irrigator cannot hold off all others from changing the quality of pure water which he uses for irrigation on the possibility that some time in the future he may want to erect a water system or sell his water to a city. He has no such "inchoate right." He has a right to make application for such change but he cannot hold others off indefinitely because some time in the future he may find it profitable to sell his water. He has no right to wait for the chance to cash in on an "unearned increment." His right to a permanent change of use does not arise before the time he makes application to the State Engineer and then he must make

the proper showing. The most he has before he makes such application is the right to use the water for the purpose for which he appropriated it, which beneficial use is the basis, the limit and measure of his right. And such beneficial use is subject to the right of any other qualified member of the public to carve out of the general pool of public waters a right to appropriate those waters for a use not inconsistent with the purposes for which he has made his appropriation. It is faulty reasoning to conclude that the owner of a use right for irrigation has superimposed thereon by virtue of Section 100-3-3 another right inchoate in nature to change the type of the use and that any condemnor must pay for such right. After the appropriator applies for a change of use the case may be different. I think this faulty reasoning lies at the bottom of the *Shurtleff* case.

And even if the statutory privileges of changing the place or type of use or the place of diversion or use are to be considered as inchoate rights, they are rights which are subject always, until exercised, to the more basic right of any qualified member of the public to appropriate the water for other uses not inconsistent or in conflict with the purpose for which an appropriator took his water. If we are to consider that we are dealing with inchoate rights then every qualified member of the public has, by the same token, an inchoate right to appropriate for purposes not inconsistent with the purposes for which the appropriator took his water and if before the latter applies to change his place or type of use or point of diversion such qualified member of the public exercises such inchoate right to apply for a consistent appropriation, the one who already has acquired an appropriation would not be in a position to change his place or type of use if it would conflict or interfere with the application for appropriation by the later applicant. So while I think it confusing to speak of the right to appropriate waters and the right of those who already have obtained appropriations to change their place or type of use or place of diversion as "inchoate," whichever way one chooses to look at the matter, the existing appropriation is subject,

until application for a change of point of diversion or change of place or type of use is filed, to the possibility of such rights being cut off by some one making a valid application, prior to the application for a change, for a use of the water not inconsistent with the use for which the existing appropriation was made. What is of importance in our water law is a recognition of the paramount fact that water in this state should be used to its fullest extent possible and that in the accomplishment of such overreaching purpose no appropriator can hold up the rights of other qualified members of the public to obtain an usufructuary right not inconsistent with such already obtained use because such prior user might some time in the future desire to change his place or type of use.

I think the error of reasoning in *Shurtleff* and *Sigurd* cases and in the main opinion in the instant case arises from a more fundamental failure to keep in mind the true nature of the right which an appropriator of water has. The main opinion for instance uses such phrases as "use of the water owned" (first line). The property owned by Shurtleff, by the State Land Board or Nebeker *(Sigurd City* case), by Kimball and by Moyle in those respective cases was not real or personal property owned in fee but as pointed out earlier in this dissent, only a usufructuary right, a right of use of water. It is not a proprietory right but a usufructuary right. And the law makes such use subject always to other uses by other appropriators of the same water for all purposes not inconsistent with the use rights of prior appropriators and this to the point where such subsequent applicants for the use may, subject to administrative process before the State Engineers, substitute other waters which are suitable for the prior appropriator in the fulfillment of his use.

In the *Sigurd City* case the condemnee should have received for that portion of his water right which had been used exclusively for irrigation only the value of the right to use the water for irrigation.

The *Sigurd City* and *Shurtleff* cases, supra, decided on erroneous bases support the prevailing opinion. The *Kimball* case supported the position taken in the prevailing opinion but that support was emasculated by the amendment to the statute under which it was decided and, as indicated earlier in this opinion, the amending of the statute tends to support my position.

I shall now discuss cases which support my thesis. In the early case of *Whitmore* v. *Utah Fuel*, 1913, 42 Utah 470, 131 P. 907, 910, this court discussed damages for deprivation of a water right:

### Chief Justice McCarty said:

"The court, in determining the amount of damage sustained by appellant because of the diversion of water by respondents, should have taken into consideration the different uses appellant made of the water on his ranch."

### Justice Frick concurring said:

"That value [of the water right] is to be ascertained after considering the uses to which appellant applied the water, and whatever the money value of such uses was is, I think, the measure of damages * * *. In this case it appears that the interference with appellant's source of water supply was caused by the respondents in the pursuit of some lawful enterprise. Under such circumstances neither punitive nor mere speculative damages should be allowed, but appellant's recovery should be strictly limited to the actual loss or damage he has sustained by reason of being deprived of the use of the water."

### Justice Straup said:

"I, too, think the court too much restricted the measure [of damages]. But I think my associates also too much restrict it * * *. In ascertaining this [the measure of damages] it is proper to consider the use or uses the plaintiff had made of the water, but it should not be restricted alone to that. I think it also proper to consider whatever beneficial use the plaintiff could have made of the water and every purpose for which it could have been used, not some mere speculative or conjectural use or purpose, but one of reasonable certainty and practicability. That is, the plaintiff should be at liberty to show, if he can, any reasonable, practical, and beneficial use which

naturally and ordinarily could have been made of the water. The water was his, and he had the right to use it, not only for the purposes for which he had used it, but also for other beneficial purposes for which it could have been used. It was just as valuable and beneficial to him to use it to supply the inhabitants of Sunnyside with water as it was to the defendants to take it and use it for that purpose. So in estimating the value of the water I think the plaintiff should be permitted to show, not only the uses which he had made of the water, but also the uses which naturally and ordinarily could have been made of it."

The measure of damages set by the majority in that case tends to support my position. The measure argued for by Justice Straup is in accord with and probably is the basis of the opinions in the *Kimball, Shurtleff* and *Sigurd City* case. However, did not Justice Straup make his remarks on an incorrect premise? He says "The water was his [plaintiff's]." He treats the "water" as the thing taken rather than "A right to use [water]." He assumed that the plaintiff's right was to use and to continue to have available for use water of the same quality he had been receiving irrespective of the uses to which he had been putting it. This assumption was, I think, erroneous.

What about the water pollution cases?

Section 191, Weil, Water Rights in the Western States, 2nd Ed. pp. 301 reads in part as follows:

"Injury to Quality.

"Materiality of Injury. The appropriator having an independent and exclusive right, any material interference therewith is wrongful, however reasonable it might have been between riparian owners. The rules of the common law concerning reasonableness have no application. *The question is whether the water is still substantially fit for the special purpose of the prior appropriator.* The burden of showing the materiality of the injury is upon the plaintiff, as is the burden of proof in any suit, and consequently, for example, a placer miner can have no action where later comers above muddy the stream, but still leave it fit for his purposes. In *Hill* v. *Smith*, 27 Cal. 476 the court lays down the rule as follows: 'It may be that a slight diminution or deterioration will impair his use of the water, and it may be that such use would not be impaired by a very considerable reduction in quantity or quality. The question must be determined in view of the use to which the water is applied and the other circumstances developed by the testimony'." (Italics added.)

Section 674a Farnham, Waters and Water Rights, Vol. III, page 2093 states the rule as follows:

"The rule as stated in the preceding section that the first appropriator is entitled to have the water flow to his head gate undiminished in quality by the further rule that he has no right to complain of acts which do not interfere with his rights. *Therefore, whether or not some pollution of the water of the stream will give him a right to complain will depend upon the use to which he is putting the water.* If he appropriated it for domestic purposes, he has a right to have the quality remain such that that use may continue; * * * In any case the deterioration of the quality of the water so as to render it less fit for the use of the first appropriator gives him a right to complain." (Italics added.)

The early case of *Crane* v. *Winsor,* 2 Utah 248, came to the territorial court on the pleadings. The plaintiffs had appropriated for culinary and irrigation purposes all the water of Butterfield Creek. The defendants erected an ore crusher upstream from the plaintiffs and took a portion of the flow of the creek and ran it through their machines. The water used returned to the creek but it contained chemicals which contaminated the entire stream and made the water poisonous to both animal and vegetable life. The court held the plaintiffs had stated a cause of action and the demurrer to their complaint should have been overruled.

The court made the following statement:

"The right * * * secured to the plaintiffs is to have the water flow to them in its natural state."

However, that statement went further than the facts of the case required and to that extent may be considered dicta. The plaintiff prior appropriators were certainly entitled to have the water in the creek continue to be of a quality suitable for the uses for which it was appropriated i.e. for culinary and irrigation purposes. Defendants' pollution of the stream rendered the water unfit for either of those purposes and therefore the plaintiffs had a cause of action against them. The question of whether or not the plaintiffs were entitled to have the water flow to them in its *natural* state was not before the court in that case.

A leading case on water pollution where the doctrine of appropriation applies is *Atchison* v. *Peterson*, 20 Wall. 507, 87 U. S. 507, 22 L. Ed. 414. In that case downstream senior appropriators sought to enjoin upstream junior appropriators from throwing mining "tailings" into the stream as said pollution deteriorated the quality and value of the water. The opinion was written by Mr. Justice Field a very able judge from California and outstanding in his knowledge of western water law and conditions. I shall quote at length from his opinion because it clearly shows he recognized that to maintain that an appropriator was entitled to clear water for irrigation use was in effect bringing into western water law one element of the riparian rights doctrine.

"By the common law, the riparian owner on a stream not navigable, takes the land to the center of the stream, and such owner has the right to the use of the water flowing over the land as an incident to his estate. And as all such owners on the same stream have an equality of right to the use of the water, as it naturally flows, in quality, and without diminution in quantity, except so far as such diminution may be created by a reasonable use of the water for certain domestic, agricultural or manufacturing purposes, there could not be, according to that law, any such diversion or use of the water by one owner as would work materially detriment to any other owner below him." Page 415 of 22 L. Ed., page 511 of 87 U. S.

\* \* \* \* \*

"This equality of right among all the proprietors on the same stream would have been incompatible with any extended diversion of the water by one proprietor, and its conveyance for mining purposes to points from which it could not be restored to the stream. But the government being the sole proprietor of all the public lands, whether bordering on streams or otherwise, there was no occasion for the application of the common law doctrine of riparian proprietorship with respect to the waters of those streams. The government, by its silent acquiescence, assented to the general occupation of the public lands for mining, and to encourage their free and unlimited use for that purpose, reserved such lands as were mineral from sale and the acquisition or title by settlement. And he who first connects his own labor with property thus situated and open to general exploration, does in natural justice, acquire a better right to its use and enjoyment than others who have not given such labor. \* \* \*

"This doctrine of right by prior appropriation, was recognized by the legislation of Congress in 1866. The Act granting the right of

way to ditch and canal owners over the public lands, and for other purposes, passed on the 26th of July of that year, in its 9th section declares 'That whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same.' 14 Stat. at L. 253.

*"The right to water by prior appropriation, thus recognized and established by the law of miners on the mineral lands of the public domain, is limited in every case, in quantity and quality, by the uses for which the appropriation is made.* A different use of the water subsequent does not affect the right; that is subject to the same limitations, whatever the use. *The appropriation does not confer such an absolute right to the body of the water diverted that the owner can allow it, after its diversion, to run to waste and prevent others from using it for mining or other legitimate purposes; nor does it confer such a right that he can insist upon the flow of the water without deterioration in quality, where such deterioration does not defeat nor impair the uses to which the water is applied.*

"Such was the purport of the ruling of the Supreme Court of California in *Butte Canal & Ditch Co.* v. *Vaughn*, 11 Cal. 143, 70 Am. Dec. 769 where it was held that *the first appropriator had only the right to insist that the water should be subject to his use and enjoyment to the extent of his original appropriation, and that its quality should not be impaired so as to defeat the purpose of that appropriation.* To this extent, said the court, his rights go and no further; and that, in subordination to them, subsequent appropriators may use the channel and waters of the stream, and mingle with its waters other waters, and divert them as often as they choose; that whilst enjoying his original rights the first appropriator had no cause of complaint. In the subsequent case or *Ortman* v. *Dixon*, 13 Cal. 33, the same court held to the same purport, that the measure of the right of the first appropriator or the uses for which it is taken. See, also, *Lobdell* v. *Simpson*, 2 Nev. 274, 90 Am. Dec. 537."

"What diminution of quantity, or deterioration in quality, will constitute an invasion of the rights of the first appropriator will depend upon the special circumstances of each case, considered with reference to the uses to which the water is applied. A slight deterioriation in quality might render the water unfit for drink or domestic purposes, whilst it would not sensibly impair its value for mining or irrigation. In all controversies, therefore, between him and parties subsequently claiming the water, the question for determination is necessarily whether his use and enjoyment of the water to the extent of his

original appropriation have been impaired by the acts of the defendant." Pages 416, 417 of 22 L. Ed., pages 512-517 of 87 U. S. (Italics added.)

The court applied the law to the facts of that case and found that equitable relief was not justified under the facts of that case.

The rule announced in *Atchison* v. *Peterson,* supra, was hinted at by this court in *Salt Lake City* v. *Salt Lake City Water & Electric Power Co.,* 1902, 24 Utah 249, 67 P. 672, 677, 61 L. R. A. 648. That case involved water rights in the Jordan River which flows out of Utah Lake. The court said:

"* * * but the city has not the exclusive right to manage and control the use of all the water in the lake or flowing in the river. Such water is publici juris, and others have the same right to use it as the city, so long as they do not interfere with the city's use, for the use by one must not interfer with the use by another. Nor has the city, by virtue of its appropriation, acquired a right to the corpus of the water in the lake or river. Not until the water is conducted into its canal does the corpus belong to the city. Then, however, it has the right to use it in any manner it chooses, for any beneficial purpose. The right of the city to the water is strictly usufructuary, and not proprietary, and the use by the power company does not appear to interfere with that right. The decree [of the lower court] requires the power company to discharge the water, after use by it, into the city's canal, undiminished in quantity *and unimpaired in quality.* It is simply a case of two uses of the same water under a primary and secondary appropriation, neither one necessarily interfering with the other; and both uses are beneficial to the public. *In such case the prior appropriator cannot complain simply because of the secondary use, but he has a right to insist that the water shall be subject to his use and enjoyment to the extent of his appropriation, and that its quality shall not be impaired so as to defeat the purpose of its appropriation."* (Italics added.)

In *Rocky Ford Irr. Co. and Telluride Power Co.* v. *Kents Lake Reservoir Co.,* 104 Utah 202, 135 P. 2d 108, 114, the power company contended it would suffer substantial damages if the reservoir proposed by the defendant were allowed to be built unless the dam were constructed so silt and debris would not flow into its pipe. We said:

"*However, it would seem that the doctrine that the senior appropri-
ator is entitled to water of the same quality should be limited, as the
California court has limited it, to apply only to deteriorations of
quality which would materially impair the use to which he was putting
the water.* Since Kents Lake has been forewarned that the plaintiff
will not tolerate a deterioration of quality which will injure plain-
tiff's machinery, this fact will no doubt be taken into account in con-
structing a dam; and also if suit should be necessary to prevent a
flushing down of silt, in the 'balancing of the equities' to determine
whether the court should allow damages or injunctive relief, this fact
would be considered." (Italics added.)

In other words the power company's right was to have
available for use water fit for the purpose for which it was
appropriated, that is, which would not interfere with its
use for power purposes; not to have the water of the same
quality as it was when appropriated.

I think that the rule announced in *Atchison* v. *Peterson*
is correct. It is my opinion that "beneficial use" should be
"the basis, the measure and the *limit* of all rights to the
use of water in this state" both as to quantity and quality.
An appropriator carves from the *public water rights* only
the right to use (1) water in quantity which he beneficially
uses and (2) water of a quality suitable for the use for
which he is beneficially putting that water. If the beneficial
use by which water is appropriated is for irrigation the
user acquires the right to use water of a quality suitable
for irrigation. The fact that he may actually use potable
water for irrigation does not give him the right to potable
water because he is not using the potable element in water
beneficially. He has never put to beneficial use that quality
of the water which is the difference between water fit for
culinary purposes and water fit for irrigation. He therefore
never acquired the right to that quality of the water. Such
a user is in a position comparable to one who diverts two
second feet of water but actually needs and beneficially uses
only one second foot. His right is limited to the one second
foot.

It should be clearly understood that I am not intending to
assert that because the city commingled its lake water with

the creek water thereby polluting the creek water, even though the commingled water is found to be substantially fit for irrigation, gives the city the right to commingle its unpure water with or to substitute it for the creek water. We are here determining the extent of the Moyle water rights not those of the City. Applications to appropriate, to change the use or point of diversion, to commingle, etc. must be filed with the State Engineer as provided by statute before any rights therein are created. So in this case, until the city follows the statutory procedure and makes valid filings with the State Engineer the Moyles retain the possibility of filing for a change in use which filing if legally made and ultimately approved by the State Engineer would create a vested right which could not be taken from them without just compensation. But until such time the city could have cut off the possibility of the Moyles taking advantage of the privilege granted by Section 100-3-3, U. C. A. 1943, by itself obtaining a right to commingle or substitute waters.

To sum up:

(1)   The right to the use of water which an appropriator carves out from the general pool of public property is one for beneficial use only and not one for speculation or traffic and such beneficial use is the basis, the measure and the limit of the right.

(2)   The right is one which is satisfied when such appropriator has water of quality substantially fit for the purposes for which appropriated and in quantity as measured by the amount beneficially used.

(3)   It follows from these two propositions that an appropriator has no vested right to any particular water or to water of a definite or fixed quality but only to water substantially fit for the purposes appropriated.

(4)   An appropriator has no vested right to effect a change in the type or place of use but only a right to apply for the same whereupon he must show that such change will not interfere with the vested rights of others and for

what he intends to use the water and his ability to perfect such use under the law and administrative regulations of the State Engineer.

(5) However, no person may deteriorate the water or substitute other water of a different quality for that used by the appropriator until such person has proceeded administratively to obtain the right to do so by filing with the State Engineer, this being the manner of initiating a determination as to whether the deteriorated or substituted water is substantially as fit as was the original water for the purposes for which it was appropriated.

(6) Until such application to deteriorate or substitute is filed the way is open for the appropriator to apply for a change in the type of use.

(7) Where condemnation proceedings are instituted to condemn water payment for the same may not be made in depreciated water. Nor can a court order damages for deprivation of use pending condemnation proceedings to be paid in whole or part by depreciated water. And where application to commingle, deteriorate or substitute is made to the State Engineer with right to appeal to the courts by either party condemnation is not necessary if the party seeking to deteriorate or substitute or commingle prevails. In case he does not prevail and he has the right of eminent domain he may condemn but need then pay the damages for the water right taken only on the basis of the value for the purpose for which appropriated.

In the case at bar the Moyles and their predecessors in interest appropriated certain water, some of which was used for domestic purposes and the rest for irrigation. Part of the water right acquired by the appropriation was transferred to the Big Cottonwood Tanner Ditch Co. in exchange for stock in the company. Twenty two and three-fourths units were retained by the plaintiffs and were not transferred to the company. It is this part of the Moyles' water rights which are involved in this case. Their water rights as to quality and quantity were not enlarged by the transfer of part to the irrigation company in exchange for stock in

the company. As a result of the exchange agreement between Salt Lake City and the ditch company the Moyles during the time involved in this suit received through the water mains of Salt Lake City, without expense to them, some water fit for domestic purposes. The record does not reveal whether or not the culinary water thus supplied was sufficient to fill the Moyles' right to use water fit for such purposes as measured and limited by their beneficial use of water as culinary water.

The court order dated July 23, 1926 referred to in the main opinion authorized Salt Lake City to take the water from Big Cottonwood Creek then flowing in Big Cottonwood Tanner Ditch and ordered the city to turn

"into said Big Cottonwood Tanner Ditch other water suitable for irrigation in lieu and place of the Big Cottonwood Creek water so taken therefrom" and to "furnish to and make available for defendants [the Moyles] for domestic and culinary purposes sufficient creek water from Big Cottonwood Creek."

I think the judgment of the lower court should be reversed and the case remanded for further proceedings including the taking of additional evidence. The following questions should be resolved:

1. To the use of how much water fit for culinary purposes were Moyles entitled?

2. Was sufficient culinary water to satisfy that appropriation available to Moyles through the pipes of the city without cost to them from July 23, 1926 (date of the involved court order) to July 20, 1939 (date this action was commenced)? If not, what was the extent of the deficiency?

3. Did the city obtain administrative approval to deteriorate or substitute for the creek water?

4. Was the mixture of Utah Lake and creek water available to Moyle for irrigation during that period substantially as fit for irrigation purposes as the creek water alone?

5. Was there available to the Moyles in the ditch at all times during the period a sufficient quantity of water to take the place of that part of the 22¾ units (which they

owned independently of their corporation water) which had been appropriated for irrigation? If not, what was the extent of the deficiency?

If it is found that the deterioration or exchange was made *with* approval of the State Engineer after following the procedure outlined by the statute for obtaining that approval, the condemnation suit was unnecessary and one or more of the following results will ensue:

A. If all of the culinary water the Moyles were entitled to was available to them without cost through the pipes of the city and the mixture of creek and lake water available for irrigation was substantially as fit for irrigation as was the creek water and was available in sufficient quantity, the Moyles suffered no damage.

B. If less culinary water was available without cost to them, the Moyles are entitled to damages which would reflect the value of the use of the water they were deprived of for culinary purposes.

C. If the mixture of lake and creek water was substantially less fit for irrigation than the creek water alone, the Moyles are entitled to damages for the pollution of so much of the 22¾ units as was beneficially used for irrigation purposes, whatever those damages are shown to be. The remainder of the 22¾ units being compensated for under formula "B", above.

D. If the mixture was of a suitable quality but insufficient in quantity, the Moyles are entitled to damages for deprivation of the use of the amount of that deficiency of water fit for irrigation.

If it is found that the deterioration or exchange was made by the city *without* first having obtained administrative approval, the Moyles should have money damages for the entire 22¾ units, that part which was appropriated for culinary purposes at its value of use for culinary purposes; that part which was appropriated for irrigation purposes at its value for irrigation use. The city had no right to pay in deteriorated water even though fit for irrigation purposes where it had not obtained a right to deteriorate or substitute through

the administrative process. While the court order was in effect the taking or contamination was lawful but the court could order only a money compensation for the taking or deterioration and could not order compensation in different water.

Though what has been said gives my views as to the law and what should be the disposition of this case two other matters should be mentioned.

Even under the theory of the majority of the court as to damages that part of the trial court's judgment which gives the plaintiffs $350 as damages sustained from the "time of filing the complaint to the time of judgment" is not by any stretch of the imagination supported by the pleadings or the proof and should not be affirmed.

The second proposition: I think it well to mention that the city urges as a bar to this action Section 15-7-76, Revised Statutes of Utah, 1933, now same section U. C. A. 1943. It urges that the plaintiffs did not file their claim with the city until April 17, 1939 though the condemnation suit was dismissed on January 7, 1938 and therefore the claim was not filed within one year after the cause of action arose as is required by the cited statute. It is my opinion that Section 15-7-76 has no application to the claim here involved as to damages for deprivation of the use of the water right from the date of the court order to the date of the dismissal of the condemnation suit by the city. The purpose of 15-7-76 was so that the city would be apprised of the details of any ordinary claims in order that agents of the city could timely and promptly look after the city's interest in securing evidence, etc., to defend any subsequent suits or as a basis for settlement. In the case at bar the city started condemnation proceedings. The agents of the city were fully apprised of what it was trying to take from the Moyles and in such situation I think no presentation of claim is required. The ordinary statutes of limitations govern.

As to the claim for damages after the dismissal of the condemnation action the claim was filed within the time allowed by Section 15-7-76.

PRATT, Justice, not participating.